**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0011n.06

No. 09-4530

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jan 06, 2012*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,                )
                                         )
    Plaintiff-Appellee,              )
                                         )
                                         )   ON APPEAL FROM THE UNITED
v.                                       )   STATES DISTRICT COURT FOR THE
                                         )   NORTHERN DISTRICT OF OHIO
PAUL D. BROWN,                           )
                                         )
    Defendant-Appellant.             )


Before: GIBBONS, ROGERS, and COOK, Circuit Judges.

COOK, Circuit Judge. In this appeal of a district court's denial of a motion to suppress, we must determine whether an officer violated the Fourth Amendment by detaining defendant-appellant Paul Brown and confiscating his gun. Concluding that the officer did not, we affirm.

I.

A grand jury indicted Brown under 18 U.S.C. § 922(g)(1) with one count of being a felon in possession of a firearm. Brown moved to suppress the gun, and the district court denied the motion after hearing testimony from the arresting officer, Douglas Pesa, that revealed the following facts. Ashton Jackson, a 17-year-old Youngstown resident, was last seen alive in the early-morning hours of May 25, 2009. When Ashton failed to come home later that night, his mother reported him missing. Officer Pesa, who routinely patrolled Mrs. Jackson's high-crime neighborhood, responded

to the call. When he arrived at around eleven o'clock, he saw Mrs. Jackson standing outside, "a bit agitated" and "upset."

Mrs. Jackson related to Officer Pesa what she heard from Ashton's cousin: that Ashton left the house at about eleven o'clock the previous night with Brown and a friend, Raymond Patterson, and that he returned briefly around four thirty the next morning before leaving again. The cousin's story prompted Mrs. Jackson to call Brown, who, though initially hesitant, eventually "met up with her," offered "to take her places," and disclosed some additional details about the prior evening. Officer Pesa determined that, in order to locate Ashton, he would need to speak with Brown, since Brown "was the last known person to be with" Ashton.

As it happened, while Officer Pesa talked to Mrs. Jackson and Ashton's cousin, a gold Chevy Blazer drove by. Mrs. Jackson and Ashton's cousin identified the vehicle as Brown's and identified Brown as the driver. As the car passed them, Officer Pesa "holler[ed] for [Brown] to come here." Brown pulled into a driveway, turned around, and headed back toward the Jackson residence. Officer Pesa then yelled at Brown to stop, and he did. Approaching Brown's car, Officer Pesa told Brown that he "needed to speak with him." During this exchange, Brown appeared panicked, confused, and about to cry. He repeatedly requested to go to his grandmother's house, promising to come right back. And he repeatedly glanced at Officer Pesa's gun and shifted nervously in the car. Officer Pesa refused Brown's request to leave.

At some point during the conversation with Officer Pesa, Brown removed his hands from the steering wheel, placing them out of Officer Pesa's view. Fearing that Brown could access a weapon, Officer Pesa asked Brown to get out of his vehicle. Brown complied, but immediately began "looking from his left to his right"—behavior that, in Officer Pesa's thirteen years of experience, precedes an attempt to escape. At the same time, Officer Pesa noticed that eight to ten people had gathered behind him and Brown. To protect his own safety as well as the crowd's and Brown's, Officer Pesa "secure[d] [Brown] against the car," intending to "get him into a safe and secure environment." When Officer Pesa pressed up against Brown, Officer Pesa felt a hard object in Brown's waist area that he immediately recognized as a firearm. Officer Pesa then instructed Brown to put his hands behind his back and handcuffed him. Pesa took the firearm from Brown and placed him in the cruiser. Once in the cruiser, Brown told Officer Pesa that Patterson gave him the firearm and that Ashton "was shot, [and] that he was dead behind a house on the east side." The police recovered Ashton's body based on this tip.

The district court denied Brown's motion to suppress the gun, concluding that, against the backdrop of Ashton's disappearance, Officer Pesa took a justifiable "common sense approach":

> [H]e does what a good officer of 13 years['] experience . . . would do in this . . . situation. He flags you down, you stop. He observes you . . . . And any normal officer being by himself in uniform, making the observations that are really uncontested here, that you were very agitated and nervous, you moved your hands from the wheel, you were eyeing his service weapon, he has information . . . that something may be wrong with this young man [who's] missing, and then he sees a crowd approaching, and as he correctly says, he doesn't know whether the crowd is

either anti-him or anti-you, or neither or both.  He's not sure.  So the smart thing to
do is to secure you and to secure himself to make sure both of you are safe.

Consistent with these findings, the court held Officer Pesa's stop to be reasonable under *Terry v.*

*Ohio*, 392 U.S. 1 (1968) and its progeny because "he did what he had to do and made a stop and

made an inquiry."

## II.

### A.  Standard of Review

When analyzing a motion to suppress, we construe the evidence in the light most favorable

to the government, review the district court's findings of fact for clear error, and apply de novo

review to questions of law.  *United States v. Blair*, 524 F.3d 740, 747-48 (6th Cir. 2008).  The

reasonableness of a search and seizure raises a question of law under the Fourth Amendment.  *Id.*

"A district court's 'denial of a motion to suppress will be affirmed on appeal if proper for any

reason[,]' even one not relied upon by that court."  *United States v. Garza*, 10 F.3d 1241, 1245 (6th

Cir. 1993) (quoting *United States v. Barrett*, 890 F.2d 855, 860 (6th Cir. 1989)).

### B.  Analysis

The parties contest whether Officer Pesa reasonably seized and searched Brown.  Since

Officer Pesa's actions arose from "the on-the-spot observations of the officer on the beat—which

historically has not been, and as a practical matter could not be, subjected to the warrant procedure,"

we evaluate his actions under the Fourth Amendment's general unreasonable-search-and-seizure

proscription. *See Terry*, 392 U.S. at 20. This "reasonableness" turns on whether "the circumstances,

viewed objectively, justify [the challenged] action," *Scott v. United States*, 436 U.S. 128, 138 (1978),

"whatever the subjective intent" motivating the relevant officials, *Whren v. United States*, 517 U.S.

806, 814 (1996) (emphasis omitted).

### 1.  Defendant Consents to Officer's Request to Stop

A Fourth Amendment "seizure" occurs when, "in view of all of the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave."

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980).[1] When Mrs. Jackson and Ashton's cousin

first alerted Officer Pesa to Brown, Officer Pesa called out to Brown to come over. At that point,

Brown responded by going two houses past, pulling his car into a driveway, backing out, and driving

back toward Pesa. As we noted in *United States v. Matthews*, simply calling out to someone to come

over to talk does not constitute a seizure. 278 F.3d 560, 562 (6th Cir. 2002) (determining that the

statement, "Hey, buddy, come here," did not constitute a stop because the addressee could have

"politely declined to do so, and walked away"); *see also Florida v. Bostick*, 501 U.S. 429,  434

(1991) ("[M]ere police questioning does not constitute a seizure."); *Florida v. Rodriguez*, 469 U.S.

1, 5-6 (1984) ("The initial contact between the officers and respondent, where they simply asked if

---

[1]At oral argument, defense counsel conceded that no seizure occurred until the moment Officer Pesa denied Brown's request to leave. We address this point in greater detail, however, because Brown's brief contrarily claims that seizure occurred when Officer Pesa told Brown to stop.

he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest."). We acknowledge that other cases hold that an officer's order to stop constitutes a seizure, *see United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010) ("Stopping after being ordered to stop triggers the Fourth Amendment."); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (holding that seizure occurred when officer instructed defendant to "just hang out right here for me, okay?"), but conclude that the circumstances at play here distinguish this case. *See Bostick*, 501 U.S. at 439 (rejecting efforts to construct per se rules to determine lack of consent and emphasizing principle that, "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter").

We may reasonably infer from Brown's decision to turn his car around and drive toward Officer Pesa that Brown consented to stopping to oblige an officer's request. *See Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Although Officer Pesa followed up his request to "come here" with a request to stop, nothing in the record suggests that Brown stopped because of Officer Pesa's later instruction. Rather, Officer Pesa's request came after Brown already turned his car around, evincing an intent to stop. Officer Pesa's second request is best interpreted as a continuation or renewal of the initial request, rather than as an escalating, coercive order. *See*

*Florida v. Rodriguez*, 469 U.S. 1, 4 (1984) (holding that consensual interaction occurred when officer first asked defendant to talk with him, defendant consented, and officer then asked defendant to step fifteen feet aside to talk). Brown's behavior in advance of Officer Pesa's request to stop suggests that Brown stopped and engaged in a conversation with Officer Pesa voluntarily.

### 2. Community Caretaking Interest Would Justify Nonconsensual Stop

We further note that even if the stop were nonconsensual, the community-caretaking function of locating missing minors would permit an officer to stop a key eyewitness when prompt inquiry may assist in finding the minor before he comes to harm. *See Cady v. Dombrowski*, 413 U.S. 433, 441, 446-48 (1973) (acknowledging the reasonableness of certain intrusions incident to everyday functions of local police, "totally divorced from the detection, investigation, or acquisition of evidence *relating to the violation of a criminal statute*" (emphasis added)).

Unlike the agents in *United States v. Williams*, 354 F.3d 497, 500 (6th Cir. 2003), Officer Pesa was responding to a distress call rather than investigating a crime complaint. By the time Officer Pesa asked Brown to stop, a reasonable officer in his position would have known enough to conclude that this was not a "normal missing person case" and that Brown might have useful information as the person last seen with Ashton, but not enough to suspect Brown of foul play. *See Taylor v. Michigan Dep't of Natural Res.*, 502 F.3d 452, 457 (6th Cir. 2007) (observing that the community caretaking rationale for government intrusion requires consideration of objective reasonableness, rather than subjective intent). Mrs. Jackson told Officer Pesa that Ashton had been

out with Brown; that Brown mentioned committing robberies with another individual earlier that day; that Ashton might have left with the individual, who wished to commit more robberies; and that Brown was the last person seen with Ashton. Officer Pesa saw Mrs. Jackson's distress and, given her familiarity with her son's habits, reasonably credited her concern "that there was something else going on . . . , [and that] there was . . . something seriously wrong with her son." Officer Pesa also appreciated that Ashton lived in a "high-crime area," known for "homicides, drug activity, lots of gunfire, . . . [and] prostitution," and that Ashton had been missing for many hours.

At the same time, Officer Pesa had no evidence that Brown *harmed* Ashton. He had yet to see Brown's extreme reaction to Ashton's mother, his panicked demeanor, or his furtive behavior. And he had no evidence of Brown's participation in other criminal activity aside from Mrs. Jackson's uncorroborated story that Brown told her about committing some robberies. In such circumstances, a reasonable officer would have stopped Brown for the sole purpose of locating Ashton, rather than sidetracking on a speculative robbery, kidnapping, or murder investigation.

No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions. Brown argues that we should not extend the community caretaking function to the context of police detention of a non-suspect merely because he may offer useful information. He urges that we separate the caretaking rationale from the exigency rationale, lest the blurring be used to unduly expand governmental-seizure authority. The *reasonableness* touchstone of Fourth Amendment analysis addresses such concerns. *Brigham City v. Stuart*, 547 U.S. 398, 403

(2006). *Compare id.* at 406 (ruling officers' intrusion into home plainly reasonable, given role of peace officer in preventing violence and indications that a juvenile in the house faced physical danger), and *United States v. Rohrig*, 98 F.3d 1506, 1522 (6th Cir. 1996) (concluding that officers responding to neighbors' complaints reasonably entered home blaring music in early morning hours, after inhabitant's nonresponsiveness), *with Williams*, 354 F.3d at 508-09 (ruling as unreasonable drug enforcement agents' entry into property where purported water leak posed no immediate danger), and *United States v. Gross*, 662 F.3d 393, 400-01 (6th Cir. June 15, 2011) (concluding that officer unreasonably blocked legally parked car with engine running but no driver, when he only wanted to check on the slumped passenger's well-being). Although Brown correctly notes that this circuit has yet to apply the caretaking rationale in the context of information seeking, no circuit proscribes this application. We conclude that had this stop been non-consensual, the caretaking exception would have defeated Brown's Fourth Amendment challenge.

### 3. Reasonable Suspicion Justifies the Denial of Request to Leave

When Officer Pesa denied Brown's request to leave, the encounter changed from voluntary to compulsory. We uphold the constitutionality of this seizure because Brown's actions in the officer's presence following the voluntary stop support a reasonable suspicion that Brown participated in criminal activity. *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (explaining that brief investigatory stop passes constitutional muster if "law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" and "the degree

of intrusion . . . was reasonably related in scope to the situation at hand" (internal quotation marks omitted)).

We examine the "totality of the circumstances" to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing, taking into account the inferences that officers may draw from their experiences and specialized training that "might well elude an untrained person." *See Arvizu*, 534 U.S. at 273 (citing *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)). Officer Pesa had reason to believe that Ashton's disappearance was abnormal, even for a missing persons case. *See United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (concluding that contextual considerations such as time of night and high-crime surroundings "are relevant to the reasonable suspicion calculus," together with indicia). Once Brown approached Officer Pesa and saw him with Ashton's mother, he "started to become extremely agitated," even before Officer Pesa had a chance to explain why he wanted to talk. Rather than addressing the officer, Brown immediately turned to the mother and began yelling repeatedly, "Why are you going to do me like this?" Officer Pesa observed Brown's behavior approach panic, where he seemed confused and "very worked up, almost to the point of start[ing] to cry." Officer Pesa then reassured Brown that he just wanted to talk with him about the missing minor, but this did not abate Brown's terror. An officer may reasonably conclude that such behavior goes beyond the ordinary nervousness one might expect from interacting with an authority figure. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Officer Pesa also noticed that Brown, in addition to working himself up to a "very

panicked agitated state," repeatedly glanced at Officer Pesa's gun during the conversation that followed. *See Caruthers*, 458 F.3d at 466 ("Furtive movements made in response to a police presence may properly contribute to an officer's suspicions."). By the time Officer Pesa denied Brown's request to go to his grandmother's house, a reasonably cautious officer in his position would have known "specific and articulable facts which [give] rise to reasonable suspicion" of Brown's involvement in criminal activity.

Since "the police can stop and briefly detain a person for investigative purposes" when the officer reasonably suspects criminal activity, *United States v. Sokolow*, 490 U.S. 1, 7 (1989), we conclude that Officer Pesa's refusal of Brown's request to leave "reasonably relate[d] in scope" to the governmental interest in investigating Brown's involvement in Ashton's disappearance.

### 4. Safety Concerns Justify Later Intrusions

Eventually, what began as consensual cooperation followed by an investigatory stop escalated into a detention and arrest. Like the district court, we discern no constitutional violation in Officer Pesa's further actions.

Officer Pesa's concern for his safety justified his asking Brown to step out of his vehicle. As Officer Pesa explained, "[Losing sight of a person's hands is] your number one threat. You know, when you lose sight of your hands, someone's hands, it becomes an extreme safety issue." *See Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("[W]e have specifically recognized the

inordinate risk confronting an officer as he approaches a person seated in an automobile."). Weighing the officer's safety against the *de minimis* intrusion of asking an already legitimately stopped individual to step out of his vehicle, we conclude that Officer Pesa acted reasonably in asking Brown to leave his vehicle. *See id.* (concluding that where the "only question is whether [the detained] shall spend that period sitting in the driver's seat of his car or standing alongside it," such "additional intrusion can only be described as *de minimis*.").

Brown's conduct upon exiting the vehicle justified Officer Pesa's move toward him to block any attempt to flee. The crowd of uncertain affiliation gathering behind Pesa, the lone officer in the high-crime neighborhood, justified Pesa's moving in to block Brown's escape and to place himself between the potentially hostile crowd and Brown.

As Officer Pesa bumped against Brown, he felt the distinctive bulge of a firearm at Brown's waist. Officer Pesa could reasonably conclude at that point that Brown posed a danger: he now knew that Brown, in addition to showing signs of flight-or-fight panic, had ready access to a gun. *See Terry*, 392 U.S. at 24 (holding that officer may "take necessary measures" to neutralize the threat of physical harm). Officer Pesa justifiably concluded that Brown was armed and dangerous, supporting handcuffing Brown and confiscating the weapon.

III.

Because none of the intrusions in the chain of events leading to the gun's seizure violated the

Fourth Amendment, we affirm the denial of Brown's motion to suppress.