RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RICHARD L. CLEMONS,

*Plaintiff-Appellant*,

     *v.*

JOHN COUCH, Individually,

*Defendant-Appellee*.

No. 19-6411

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:17-cv-00063—Hanly A. Ingram, Magistrate Judge.

Argued: October 22, 2020

Decided and Filed: July 7, 2021

Before: COOK, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Bethany N. Baxter, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, for Appellant. Brenn O. Combs, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Bethany N. Baxter, Joe F. Childers, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, for Appellant. Brenn O. Combs, Shawna Kincer, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee.

BUSH, J., delivered the opinion of the court in which COOK, J., joined. NALBANDIAN, J. (pp. 12–19), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

JOHN K. BUSH, Circuit Judge.  Many families live through their fair share of drama during the holidays.  But on Easter Sunday, March 27, 2016, the Clemons family experienced more than they might have expected.  As the result of a family feud that sparked a home visit by a state trooper, three members of the family were arrested and the litigation giving rise to this appeal ensued.

The trouble arose when Kentucky State Trooper John Couch escorted Christina Clemons so she could retrieve some personal belongings from the residence of her in-laws, Evalee and Richard Clemons, where Christina and her then-husband, Dustin Clemons, had been staying.  That living arrangement changed, however, after Christina fought with her in-laws and they ordered her out.  When Christina returned to gather her things, she brought along reinforcements—her mother and Trooper Couch.  Upon Couch's entry into the house, he exchanged words with Christina's father-in-law, Richard, who objected to Couch's presence in his home.  As the trooper was leaving, Richard told Couch that he smelled "like pig shit."  The trooper responded by clobbering the father-in-law, who fought back.  Evalee and Dustin soon joined in the melee.  Easter evening ended with Couch's arrest of all three.  Months later, a grand jury declined to indict any of the Clemons family.

On March 13, 2017, Richard Clemons filed suit against Couch and others, alleging, as relevant on appeal, that Couch entered his home without a warrant in violation of the Fourth Amendment.  A magistrate judge, hearing the case by consent of the parties, granted Couch qualified immunity on the unlawful-entry claim.  The court determined that Couch's entry was justified by the "community caretaker" exception to the Fourth Amendment's warrant requirement, and that Couch also had Christina's consent to enter the home.  Richard appeals.

We reverse and remand for further proceedings.

I.

This sad story begins with a fire that damaged the home of Christina, Dustin, and their young son. As a result, in December 2015 or January 2016, they moved in with Dustin's parents, Richard and Evalee, in Hazard, Kentucky.[1] A house fire was not the only thing that troubled the Clemonses, for around the same time, Christina filed for divorce from Dustin, and the two separated. The conflict between Christina and Dustin extended to include her in-laws. On March 25, 2016, Christina and Evalee got into an argument that escalated into a physical altercation. Richard broke up the fight, and either he or his wife told Christina to leave, which she did.

Two days later, on Easter Sunday, March 27, 2016, Christina went to the local Kentucky State Police station with her mother and requested a law-enforcement escort to accompany her to the Clemonses' house so she could retrieve some of her and her son's belongings. Christina told the police she was separated from her husband and having difficulties with her in-laws. She said that she was afraid to go back to the residence by herself, in part because her in-laws had threatened her. Trooper Couch was assigned to accompany Christina to the Clemonses' home. Couch did not inquire further into Christina's living arrangement, her domestic situation, or her history with Dustin or her in-laws. Instead, he simply followed Christina and her mother to the Clemonses' residence.

They arrived around 7:30 P.M. The three let themselves in so that Christina could retrieve her and her son's belongings. They came upon Richard and Evalee, who looked up from the television in shock. It was startling enough to see Christina but added to the surprise were Christina's mother and the state trooper. Richard and Evalee were particularly disturbed that law enforcement had entered their home. So was Dustin, who had been outside grilling steaks for Easter dinner. Inside, Richard became hostile as Christina went to retrieve her possessions. He shouted that he did not want Christina, Christina's mother, or the state trooper in his home.

---

[1]For purposes of ruling on the qualified-immunity issue relevant in this appeal, we adopt Richard's version of the facts because they are not "so utterly discredited by the record that no reasonable jury could have believed [them]." *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012).

He expressed this sentiment to Couch directly: "I don't want you in my house . . . I don't want these women in my house . . . You can't do this . . . I want you out of my house." He also told the officer, "I want you to leave my home. You have no right here." Couch, however, would have none of it. According to Richard, the trooper "just stood there" and demanded that Richard "sit down and shut up," while he waited for Christina to finish packing her things. Richard then took the matter into his own hands, first with a cellphone. Richard called the police—his son-in-law John Napier, a Perry County sheriff's deputy, who was on his regular patrol.

Soon after Officer Napier arrived at the Clemonses' residence, Christina finished collecting her belongings. As she was exiting the house for good, Couch followed behind her. According to Richard, he walked towards the two to shut the door behind them as they were exiting and told Couch that he smelled "like pig shit." Based on Richard's account, Couch responded by "clobber[ing]" him. The two then began to fight, and Evalee and Dustin, back from the grill, soon joined in the fray. Officer Napier managed to disrupt the brawl for a moment, after which Couch deployed his taser to subdue Richard and Dustin.

The episode ended with Richard, Dustin, and Evalee being placed under arrest. Couch variously cited them for menacing, disorderly conduct, assault of a police officer, and resisting arrest. But later, a grand jury declined to issue any indictments.

II.

About a year after the incident, Richard filed a civil-rights action against the Commonwealth of Kentucky, the Kentucky State Police, and Trooper Couch in his official and individual capacities. Richard alleged claims under 42 U.S.C. § 1983 for wrongful entry, excessive force, wrongful arrest, deliberate indifference, and failure to train, and state-law claims for negligence, assault, battery, false imprisonment, malicious prosecution, and both negligent and intentional infliction of emotional distress. The magistrate judge dismissed with prejudice the § 1983 claims against the Commonwealth, the state police, and Couch in his official capacity. The court also dismissed the state-law claims, but without prejudice.

With the court's permission, Richard amended his original complaint. In doing so, he presented the same claims he had asserted in his original complaint, even though the court had

already dismissed a number of those counts—some with prejudice, some without. Couch filed a motion for summary judgment, arguing that he was entitled to qualified immunity. The magistrate judge granted the motion in part and denied it in part. Specifically, the court denied summary judgment on the claims for wrongful arrest, excessive force, assault, battery, false imprisonment, and malicious prosecution (Richard later dismissed the latter four claims). It also granted summary judgment to Couch on the claims for negligent and intentional infliction of emotional distress and noted its prior dismissal of the claims for deliberate indifference and failure to train. But because the court planned to grant summary judgment to Couch on the unlawful-entry claim on a basis not briefed by either party—the community-caretaker exception—it postponed final judgment on that claim and gave the parties ten days to respond to its application of the exception.

After the parties submitted their supplemental briefing, the magistrate judge issued a second order granting Couch's motion for summary judgment as to the unlawful-entry claim. The court reasoned that Couch was entitled to qualified immunity because his warrantless entry was justified by the community-caretaker exception and even if it was not, Couch was still entitled to immunity given that the law was not sufficiently clear on the issue. The magistrate judge also found that Couch's warrantless entry was permissible in part because of Christina's voluntary consent.

Richard appealed the court's second order granting qualified immunity on the unlawful-entry claim, and we dismissed the interlocutory appeal for jurisdictional reasons. Couch, on the other hand, appealed the court's first order denying qualified immunity as to the wrongful-arrest and excessive-force claims. Again, we dismissed the appeal. Accordingly, the parties proceeded to trial on the wrongful-arrest and excessive-force claims. After a three-day trial, the jury returned a verdict in favor of Couch. Richard does not appeal the jury's verdict. Instead, he appeals the magistrate judge's summary-judgment ruling that Couch was entitled to qualified immunity on his unlawful-entry claim.

III.

We review a grant of summary judgment de novo. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary-judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

On appeal, Richard contends that Couch is not entitled to qualified immunity because it was clearly established that the community-caretaker exception did not apply to Couch's warrantless entry and because Couch had no consent to enter the Clemonses' home.[2] "We analyze whether an officer is entitled to qualified immunity using two steps: (1) whether the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020).

A. CONSTITUTIONAL VIOLATION

In the first step of our qualified-immunity analysis, we must determine whether Couch violated Richard's Fourth Amendment right to be free from the state's warrantless entry into his home. Although warrantless entry into the home is presumptively unconstitutional, there are some limited exceptions that can overcome that presumption. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009). To justify his actions, Couch points to the community-caretaker exception.[3]

---

[2]In the last clause of the last sentence in his opening brief on appeal, Richard also asks us to grant him a new trial on all his federal claims. But he does not further develop or argue the issue in either his opening or reply brief, and Couch does not respond. "Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) (citing *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)). Accordingly, we deem Richard's request for a new trial on all his federal claims forfeited.

[3]Couch's additional argument that he had consent to enter the Clemonses' home is not our focus here. Richard asserts that he revoked whatever consent Couch was given shortly after Couch entered his home.

The first mention of that alleged exception came from the Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  In *Cady*, the Court held that a police officer's warrantless search of a vehicle did not violate the Fourth Amendment.  The searched vehicle was involved in an accident, and after towing it to a temporary holding lot, an officer opened and inspected the trunk, suspecting that a weapon might be present.  *Id.* at 443.  In holding that the officer's search was reasonable, the Court discussed the "community caretaking functions" that officers are often responsible for, such as attending to vehicle accidents on public highways.  *Id.* at 441.  It concluded that police activity in furtherance of community-caretaking functions—at least in the motor-vehicle context—does not offend the Fourth Amendment so long as it is executed in a reasonable manner pursuant to "state law or sound police procedure."  *Id.* at 447–48; *see also South Dakota v. Opperman*, 428 U.S. 364, 374–75 (1976).

For nearly half a century after *Cady*, the Supreme Court declined to further elucidate the principles discussed in that case.  That left the federal courts of appeals to the task.  Over time, nearly every circuit unearthed from *Cady* a community-caretaker exception to the warrant requirement of the Fourth Amendment.  *See, e.g.*, *Corrigan v. District of Columbia*, 841 F.3d 1022, 1034 (D.C. Cir. 2016) (listing cases).  Several circuits, including our own, discussed the exception in the context of warrantless searches and seizures in the home.  *See, e.g.*, *United States v. Rohrig*, 98 F.3d 1506, 1522–25 (6th Cir. 1996).  But recently, in *Caniglia v. Strom*, the Supreme Court clarified that *Cady* "does not" create a "standalone doctrine that justifies warrantless searches and seizures in the home."  141 S. Ct. 1596, 1598 (2021).  It explained that the so-called community-caretaker exception "goes beyond anything [the] Court has recognized."  *Id.* at 1599.

---

Couch contends that no such revocation occurred.  That dispute is for the jury to resolve.  Adopting Richard's version of the facts and construing them in the light most favorable to him, as we must in determining Couch's entitlement to qualified immunity at summary judgment, Richard's demand that Couch leave negated any consent that Couch may have had to enter the home.  *See Georgia v. Randolph*, 547 U.S. 103, 114 (2006).

*Caniglia* makes clear that Couch cannot justify his warrantless entry into Richard's home by calling on the community-caretaker exception. Without any other valid justification for his entry, we hold that Couch violated Richard's Fourth Amendment rights.[4]

B. CLEARLY ESTABLISHED RIGHT

In the second step of our qualified-immunity analysis, we must determine whether Richard's constitutional right was clearly established at the time of the alleged violation. We decide the issue by examining whether the contours of Richard's constitutional right were "sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional." *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016). "In determining whether a right was clearly established, we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents 'placed the . . . constitutional question beyond debate.'" *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). If the Supreme Court had not yet discussed the matter and the right was clearly established within our circuit at the time of the alleged violation, our inquiry ends. *See Wright*, 962 F.3d at 869–70. Here, we must determine whether the law regarding the community-caretaker exception was clearly established such that it would have been apparent to a reasonable officer in Couch's position that the exception did not apply to his warrantless entry into Richard's home.

We now know, based on *Caniglia*, that the community-caretaker exception, to the extent it exists at all, does not apply to the home. *Caniglia*, 141 S. Ct. at 1598. But *Caniglia*, of course, had not been decided by the date of the events in question, March 27, 2016. At that time, a reasonable officer in Couch's position could have determined—based on *Cady*, and our pre-2016

---

[4]In a last-ditch effort to avoid that conclusion, Couch suggests that the Fourth Amendment does not apply to this case at all. First, he claims that the Amendment does not apply to his exercise of non-criminal government authority. He is mistaken. "[T]he Fourth Amendment [is] applicable to the activities of civil as well as criminal authorities." *Andrews v. Hickman County*, 700 F.3d 845, 858–59 (6th Cir. 2012) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985)). Second, he contends that the Fourth Amendment might not be relevant because even if he had wanted to, he could not have obtained a warrant or court order to help Christina retrieve her and her son's personal belongings from the Clemonses' home. But the Kentucky statute that Couch describes as authorizing his conduct in this case speaks of such an order. *See* Ky. Rev. St. § 403.785. And in his deposition, Couch stated that he could have obtained paperwork from the county attorney or an order from a local judge signing off on his assistance.

precedent interpreting *Cady*—that the community-caretaker exception applied to an officer's home entry, at least as a general matter. *See Rohrig*, 98 F.3d at 1523 (noting, in the context of a warrantless home entry, that the warrant clause is "implicated to a lesser degree" when a police officer is engaged in community caretaking); *United States v. Washington*, 573 F.3d 279, 286–89 (6th Cir. 2009) (assuming without deciding that the exception applies to the home). *But see United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("[W]e doubt that community caretaking will generally justify warrantless entries into private homes.").

That does not, however, absolve Couch of potential liability. For it was clearly established before March 27, 2016, that if the exception applied to home entry, it could "not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large." *Washington*, 573 F.3d at 289; *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (reiterating that requirement three years after Couch's warrantless entry). That principle made clear that Couch's actions could not fall within the community-caretaker exception.[5]

Couch may have been engaged in community caretaking when he accompanied Christina to collect her and her son's belongings. Christina was afraid to go to the Clemonses' house alone, perhaps for good reason, and Couch was her requested escort. But the need for entry was not urgent. Construing the facts in the light most favorable to Richard, any delay in Couch's entry into the residence—to obtain a warrant or court order permitting his entry—was not "reasonably likely to result in injury or ongoing harm to the community at large." *Washington*, 573 F.3d at 289. We decline to hold that sufficient injury would have or could have resulted if Christina had been forced to delay the collection of her and her son's belongings. True, the son was to attend school the next day and required his school supplies and attire, but that type of

---

[5]The dissent suggests that three of our cases cast doubt on *Washington*'s enunciation of the community caretaker exception. *See* Dissent at 13–14, & n.8. But none of those cases involves the exception's application to the home. *See Reid Mach. Inc. v. Lanzer*, 421 F. App'x 497, 500–01 (6th Cir. 2010); *United States v. Lewis*, 869 F.3d 460, 461–62 (6th Cir. 2017); *United States v. Brown*, 447 F. App'x 706, 706 (6th Cir. 2012). Nor do they otherwise conflict with *Washington*. *Lanzer* held that the exception applied to the removal of a superload truck from the side of a busy highway to alleviate the harm to public safety that would exist if the truck were left there. 421 F. App'x at 506. *Lewis* expressly declined to apply *Washington*, but only because *Washington* involved the search of a home, not—as relevant in *Lewis*—a vehicle. 869 F.3d at 464. And *Brown* involved an "*immediate* caretaking interest." 447 F. App'x at 709–10 (emphasis added).

harm does not reach the level of harm required by *Washington* to permit the state's warrantless entry into Richard's home. *Id.*

Notably, Couch does not even contend that a delay was reasonably likely to result in injury or ongoing harm to the community at large. Perhaps he declines to do so because the injury or harm in this case was more speculative and personal, and thus unlike the injury or harm used to justify the exception's application to the home in other cases. *See, e.g.*, *Rohrig*, 98 F.3d at 1522 (finding loud music blaring at 1:30 AM to be a public nuisance that justified warrantless entry and search of home).

The facts in this case more closely mirror those in cases where we refused to apply the community-caretaking rationale to warrantless home entry. *See Goodwin v. City of Painesville*, 781 F.3d 314, 331 (6th Cir. 2015) (holding that an argument between two individuals in and around a private residence that lasted a short time was not "the type of ongoing and overbearing public disturbance that would give rise to the necessity for immediate action"); *see also McGraw v. Madison Township.*, 231 F. App'x 419, 425 (6th Cir. 2007) (no justification for warrantless entry where the alleged breach of the peace—a boisterous argument among individuals in their home—had ended). In those cases, as here, when law enforcement entered the plaintiffs' house, there was no ongoing public disturbance or harm to the community at large. Couch cannot ignore the limits of the community-caretaker exception as stated in *Washington*.

Nor can he simply distinguish *Washington* on its facts. His attempt to do so does not nullify our description of the contours of the community-caretaker exception in that case, where, as here, an officer entered an individual's home without a warrant and despite the individual's repeated objections. Neither does Couch's citation to out-of-circuit precedent.**[6]**

---

**[6]**We also find unpersuasive the dissent's primary theory that our community-caretaking jurisprudence is entirely unclear because it can be categorized into four distinct and conflicting lines of reasoning. *See* Dissent at 12–15. For one, Couch did not raise that argument. And we generally do not make or assume arguments on behalf of litigants. *Thomas v. Bright*, 937 F.3d 721, 729 (6th Cir. 2019). More importantly, *Washington* held in an analogous scenario that the community-caretaker exception does not apply unless delay is reasonably likely to result in injury or ongoing harm to the community at large. Couch's actions run counter to that imperative. Our inquiry should end there. That *Washington* did not hold Couch's exact conduct unconstitutional is of no matter. *See Baynes v. Cleland*, 799 F.3d 600, 611 (6th Cir. 2015) ("[A]n action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs.").

At bottom, Richard Clemons has produced evidence that would allow a reasonable jury to conclude that Couch's conduct was in violation of Richard's clearly established Fourth Amendment right to be free from the state's warrantless entry into his home. Couch is therefore not entitled to summary judgment based on qualified immunity.

IV.

With this decision, we do not intend to cast aspersions on the work done by law enforcement. Although it may seem that holding Trooper Couch potentially liable for his warrantless entry reinforces the old adage that no good deed goes unpunished, that is not our aim. Today we simply acknowledge the sanctity of the home, a notion "embedded" in our constitutional tradition "since the origins of the Republic," that protects against warrantless government intrusion. *Payton v. New York*, 445 U.S. 573, 601 (1980). It is not our role as judges to change constitutional safeguards to further what some may argue is better policy. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("Members of [the] Court[s] are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments.").

Accordingly, we reverse the magistrate judge's grant of summary judgment to Couch based on the community-caretaker exception and remand for proceedings consistent with this opinion.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.  First, I agree that the community caretaking exception (CCE) does not extend to Trooper Couch's conduct here—as well-intentioned as it was.  I do not, however, agree that it was clearly established at the time that what Trooper Couch did was unconstitutional.  So I would affirm the district court's grant of qualified immunity.  *See supra*, Maj. Op. at 10.  Second, in the absence of qualified immunity, I concur with the majority that the consent issue is a matter for further consideration in the trial court, *see supra*, Maj. Op. at 6–7 n.3, and I would clarify the legal framework that should guide the consent inquiry.

## I.  Qualified Immunity

Contrary to the majority's holding, our circuit never established a clear rule that ongoing harm to the community was necessary to invoke the CCE.  Under the clearly established prong of qualified immunity, a constitutional violation must be so clearly established by existing precedent that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).  In other words, the question must be "beyond debate."  *Id*. at 589.  The rule ferrets out intentional misconduct and plain incompetence, not judgment calls that turn out to be wrong.

When Trooper Couch helped Christina collect her belongings, little about our circuit's CCE jurisprudence could have been considered clearly established.  Despite the Fourth Amendment's generally applicable warrant requirement, the Supreme Court in *Cady* had held that certain police actions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" fell into a community-caretaking exception to that requirement.  *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  But our cases had never laid out a unified vision of the CCE.  We had applied the community-caretaking idea in at least four ways.  The first approach categorized the CCE as part of exigent circumstances analysis.  The second emphasized the difference between law enforcement activities and

community caretaking. The third stressed that ongoing harm to the community was necessary to trigger the CCE. And the fourth required only *potential* danger to justify an action under the CCE.

The cases that used the CCE as part of broader exigent circumstances analysis treated community caretaking as a plus factor in finding exigent circumstances. This approach flowed from *Rohrig*, and it reasoned that when officers are acting to protect rather than to investigate, their actions are more likely to be reasonable and less likely to implicate the Warrant Clause. *See United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996).[1]

Many other cases highlighted the officer's role in the circumstance—either as a community caretaker or an investigator—as the foundational element of the CCE. For example, we relied on this distinction in holding that the police were caretaking when they agreed to store a man's belongings until he could retrieve them. *See United States v. Coleman*, 628 F.2d 961, 964–65 (6th Cir. 1980). And we applied this view again when holding that officers were community-caretaking when they escorted an intoxicated woman to her car to make sure she had a safe ride home. *See United States v. Lewis*, 869 F.3d 460, 463 (6th Cir. 2017). We thus rejected CCE defenses when the officers were investigating criminal actions.[2]

Still a third line of cases stressed that some ongoing harm to the community was necessary to trigger the CCE, though it need not rise to the level of exigent circumstances. *Washington* sparked this emphasis, which it also pulled from *Rohrig*. *United States v. Washington*, 573 F.3d 279, 288 (6th Cir. 2009) (citing *Rohrig*, 98 F.3d at 1519). Later, *Taylor v. City of Saginaw* applied this principle in holding that the CCE did not apply to chalking car tires

---

[1]*Rohrig*, 98 F.3d at 1523 ("Moreover, although the Warrant Clause certainly is not irrelevant to the governmental intrusion at issue here, that clause nevertheless is implicated to a lesser degree when police officers act in their roles as 'community caretakers.'"); *see also United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006) (emphasizing that courts have "most frequently applied" the "risk of danger" exigency "in cases where the government actors were performing 'community-caretaker' functions rather than traditional law-enforcement functions.").

[2]*See Strutz v. Hall*, 124 F. App'x 939, 941 (6th Cir. 2005) (per curiam) (denying qualified immunity based on the CCE when issue of fact remained about whether bursting into a home to breathalyze children was for community caretaking or investigation); *United States v. Williams*, 354 F.3d 497, 507–08 (6th Cir. 2003) (refusing to apply the CCE when officers suspected drug activity); *United States v. Wilson*, 40 F. App'x 986, 987 (6th Cir. 2002) (per curiam) (refusing to apply the CCE to a routine investigation).

to track parking-time violations. 922 F.3d 328, 335–36 (6th Cir. 2019). But contrary to the majority's assumption, this view did not have overwhelming support in our caselaw.

Still other cases relied on the mere potential of danger—rather than imminent or ongoing harm—to justify acting under the CCE. This view probably had the most precedential weight even though the harm threatened was "the mere possibility of physical harm" that *Washington* condemned as insufficient. *Washington*, 573 F.3d at 288. Three years after *Cady*, we held that police could seize a weapon from an automobile without a warrant as a "public safety measure." *United States v. Isham*, 501 F.2d 989, 991 (6th Cir. 1974). Since then, we applied the CCE to allow warrantless entry of a running car,[3] seizure of an unregistered and uninsured truck,[4] approaching a running roadside car to check on the driver,[5] seizing an overweight semi-truck,[6] and shouting at a passing driver to stop for the officer to ask questions about a missing minor.[7] These cases differed from the ongoing harm cases because none of the harm threatened in these cases had yet materialized, as far as the officers knew.

Given these competing precedents, I cannot say that any reasonable officer would have latched onto the *Washington* ongoing-harm-to-the-community standard.[8] Trooper Couch could have reasonably believed, consistent with our cases, that his non-investigatory intent made his entry less intrusive or that the potential physical harm to Christina triggered the CCE. It wasn't

---

[3]*Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998).

[4]*Bybee v. City of Paducah*, 46 F. App'x 735, 737 (6th Cir. 2002) (noting that Kentucky "has determined that the safety of the public is better protected if all persons operating motor vehicles in the state maintain liability insurance and register the vehicle in the operator's state of residence").

[5]*United States v. Koger*, 152 F. App'x 429, 430 (6th Cir. 2005) (per curiam) (noting the "reasonable fear that the apparently unconscious occupant was either in danger (perhaps hurt or ill), or was impaired such that upon awaking and driving, he could constitute a danger to others").

[6]*Reid Mach. Inc. v. Lanzer*, 421 F. App'x 497, 506 (6th Cir. 2010) (finding that the police had a "community caretaking responsibility to ensure that trucks unable to continue their travel due to permit violations are protected and secured, and do not 'threaten[ ] public safety and convenience' if they remain on the roadside") (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)).

[7]*United States v. Brown*, 447 F. App'x 706, 709 (6th Cir. 2012) (reasoning that "the community-caretaking function of locating missing minors would permit an officer to stop a key eyewitness when prompt inquiry may assist in finding the minor before he comes to harm").

[8]Perhaps it merits noting that only one Sixth Circuit case following *Washington* recited and followed its imperative, while at least three CCE cases did not. *See Lanzer*, 421 F. App'x at 497; *Lewis*, 869 F.3d at 463–64; *Brown*, 447 F. App'x at 706.

clearly established that Trooper Couch had to wait for the situation to become an ongoing harm to the community—or even how to measure when that would have occurred.

Even if *Washington* were a watershed case as the majority suggests, it would still be ambiguous in its application here.  That case involved officers entering an arrested man's apartment to evict his nephew who was living there.  *Washington*, 573 F.3d at 281–82.  Upon seeing the apartment occupied and suspecting trespass, the officers entered the apartment without a warrant and seized paraphernalia.  *Id.*  The court condemned their actions, refusing to allow police to "search homes without warrants" without "any ongoing injury to the community." *Id.* at 288.  The court then discussed how the "gravity of the underlying offense" interacts with exigency claims.  *Id.* at 288–89.  But this case had no underlying offense to balance with an exigency claim, and Trooper Couch wasn't searching for anything.  Nothing in *Washington* clearly establishes that Trooper Couch's actions were unconstitutional.

The majority suggests that these lines of cases don't matter because Trooper Couch hasn't  expounded on the caselaw in this exact way.  *See* Maj. Op. at 10 n. 6.  I disagree. Trooper Couch spent almost eight pages in his appellate brief arguing that the law was not clearly established when he acted.  And he touched on the major issues of whether *Rohrig* supported his case and whether *Washington* applied at all.  In our circuit, parties raise arguments, and "a missed citation to legal authority does not establish a forfeiture of an *argument*." *United States v. Charles*, 843 F.3d 1142, 1147 (6th Cir. 2016) (emphasis in original).  We're not free to turn a blind eye to a quagmire of unclear law to deny qualified immunity when the officer has properly raised and preserved the argument.  When we determine whether the law was clearly established, "we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal, and we ask whether these precedents 'placed the . . . constitutional question beyond debate.'"  *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  If the majority can't square its conclusion with the law that existed at the time, ignoring the law is not the solution.

The majority then waves away Trooper Couch's arguments with the assertion that the facts distinguishing *Washington* don't matter because its statement of the law is clear.  *See* Maj. Op. at 12.  But even after *Washington*, our circuit has treated cases differently when officers are

"responding to a distress call rather than investigating a crime complaint." *Brown*, 447 F. App'x at 710. So it matters that *Washington* was about investigating crime while this case involves a protective function. I don't see how we can say Trooper Couch acted objectively unreasonably when he acted consistent with a view that was still viable among circuit judges.

Before *Caniglia* cleaned the slate, our circuit's discordant trains of thought on the CCE failed to establish clear rules for officers. *See Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). Since Trooper Couch did not disregard clearly established law when he acted, and he should not bear the consequences of our failure to elucidate. I would affirm the district court's grant of qualified immunity.

## II. Consent

Trooper Couch raises Christina's consent as an alternative ground for affirmance. Without qualified immunity in the picture, I agree with the majority that summary judgment is not appropriate. *See supra*, Maj. Op. at 6–7 n.3. The jury needs to decide if Christina had apparent authority to allow Trooper Couch to enter the residence. If she did not have apparent authority, then Trooper Couch cannot prevail. If she had apparent authority, the second question would be whether Richard revoked her consent. While the majority is right that there is a factual dispute on this point, the dispute might not matter if Richard didn't have the legal ability to revoke Christina's consent. After *Caniglia*, I think that this is a serious question. Our precedents on consent to enter are not the model of clarity. Now that *Caniglia* has refocused the Fourth Amendment exceptions, I want to clarify how consent should interact with non-search home entries.

This isn't the first time a court has thought about police entry to protect someone collecting her belongings. In establishing the single-tenant veto (one co-tenant's right to cancel another co-tenant's consent to a search), the Supreme Court examined this very dilemma. *Georgia v. Randolph*, 547 U.S. 103, 118 (2006). *Randolph* acknowledged the concern that the

single-tenant veto would "shield[] spousal abusers and other violent co-tenants who will refuse to allow the police to enter a dwelling when their victims ask the police for help." *Id*. at 117.[9]

The Court resolved the problem by clarifying that the single-tenant veto didn't apply to non-search entries. It distinguished between trespass and searches, saying that the standard for "when the police may enter without committing a trespass" and "when the police may enter to search for evidence" were not the same. *Id*. at 118. When it came to the tort of trespass, "so long as they have good reason to believe [a threat of domestic violence] exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely . . . however much a spouse or other co-tenant objected." *Id.* "Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes." *Id.* A single co-tenant can veto a search for evidence, but not a home entry.[10]

To put this in the broader context that *Caniglia* outlines, consent is one of the three ways that an officer can constitutionally enter a home (the other two being a warrant and exigent circumstances). *Caniglia*, 141 S. Ct. at 1599. Inside the consent exception, a single-tenant veto cancels consent to search a home, but it does not negate consent to enter for any other reason.

And for obvious reasons—otherwise the stronger or more violent tenant could use menace to keep the victim from recovering her belongings, and the police could only wait outside despite the victim's consent to enter her residence. That would allow the aggressive co-tenant to take over the rights to the property through fiat, a resolution at odds with the principles of co-tenancy the *Randolph* Court expressed.[11]

---

[9]Of course, this would have to be a non-emergency situation, or else the exigent circumstances exception would allow the entry.

[10]This part of the Court's reasoning is dicta because it "has nothing to do with the question in [that] case." *Randolph*, 547 U.S. at 119. But that's exactly the point—*Randolph* was never meant to apply outside the search context. To highlight that important caveat, the Court phrased the holding in terms of a "search . . . for evidence" and *not* entry. *Id*. at 120 ("We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

[11]Each co-tenant "has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants." *Randolph*, 547 U.S. at 114 (quoting 7 Michael Allan Wolf,

Few cases have dealt with police protection for victims recovering belongings because the CCE has blanketed this area of law ever since *Cady* in the 1970s. So CCE analysis overshadowed any argument about the reason for entry. While some district courts have applied the *Randolph* distinction,**12** several others have confused it with the community caretaking or exigent circumstances exception—though that part of *Randolph* would be meaningless if the two ideas melded.**13** The Court itself hasn't applied this language from *Randolph* for the simple reason that the Court has never again addressed how consent impacts entry that might otherwise be a trespass. *Cf. Fernandez v. California*, 571 U.S. 292, 308–09 (2014) (Scalia, J, concurring).**14**

But *Randolph*'s trespass and search distinction is still viable—perhaps even stronger—after fifteen years of legal progression.**15** "Trespass alone does not qualify [as a search], but there must be conjoined with that what was present here: an attempt to find something or to

---

*Powell on Real Property* § 50.03[1]). A co-tenant deprived of access to her belongings by intimidation does not enjoy her lawful right of use and enjoyment.

**12***See, e.g.*, *Sanders v. Detroit Police Dep't*, No. 07-14206, 2016 WL 74851, at \*2 (E.D. Mich. Jan. 7, 2016) ("As it relates to co-tenants, the general rule is that one tenant's consent to law enforcement's warrantless entry does not override a physically present co-tenant's refusal of entry to law enforcement unless law enforcement is entering a dwelling to protect a resident from domestic violence."); *Khalil v. Moore*, No. 3:10-CV-0859 JCH, 2011 WL 5910088, at \*3 (D. Conn. Nov. 28, 2011) ("When police seek to enter a home to provide protection to one tenant, rather than to search for evidence, however, a co-tenant's refusal to consent does not render the entry unconstitutional.").

**13***See* Amanda Jane Proctor, *Breaking into the Marital Home to Break Up Domestic Violence: Fourth Amendment Analysis of "Disputed Permission,"* 17 Am. U.J. Gender Soc. Pol'y & L. 139, 152 ("In an interesting development, Randolph, [sic] a third-party consent case, has spawned decisions citing 'community caretaking functions' as a potential exigency justifying a warrantless police entry into a home to protect a domestic violence victim as she retrieves her belongings.")

**14**And the Court's relevant citations to *Randolph* have been limited to its language on exigent circumstances, which is distinct from the trespass ideas it articulates. *See Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (per curiam); *Kentucky v. King*, 563 U.S. 452, 460 (2011); *Brigham City v. Stuart*, 547 U.S. 398, 403–04 (2006); *cf. Fernandez*, 571 U.S. at 294 (limiting *Randolph*'s consent search holding to cases with present objecting co-tenants).

**15**Even before *Randolph*, the Supreme Court held that the reason for entering a house can impact whether the entry is a search at all. In *Wyman v. James*, the Supreme Court dealt with required home visits by social services caseworkers. 400 U.S. 309, 317 (1971). James claimed that requiring home visits to receive social services benefits violated the Fourth Amendment, but the Court held that such a visit wasn't a search under the Fourth Amendment. *Id.*

There are also cases holding that subjective intent cannot make an objectively reasonable act into an unreasonable act. *See, e.g.*, *Brigham City*, 547 U.S. at 404. That goes to reasonableness inquiry, not to whether a search has occurred.

obtain information." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012); *see also Grady v. North Carolina*, 575 U.S. 306, 310 (2015). Likewise, our circuit recognizes that trespass and search are separate concepts, with the intent to gain information as the cornerstone of a "search" and trespass as merely one method of searching. "Law-enforcement officers conduct a 'search' when they seek to obtain information" by either physical intrusion or invasion of an expectation of privacy. *United States v. Riley*, 858 F.3d 1012, 1016 (6th Cir. 2017) (per curiam). In the context of physical intrusions, "a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information." *Taylor*, 922 F.3d at 332 (citing *Jones*, 565 U.S. at 404–05).[16]

Of course, an entry that isn't a search still implicates the Fourth Amendment. "The very core of [the Fourth Amendment] guarantee is the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia*, 141 S. Ct. at 1599 (internal quotation marks removed). That's why an officer still needs consent to enter the house, even though he needs consent from only one co-tenant regardless of another co-tenant's objections.

In sum, single-tenant consent can authorize entry even when it cannot authorize a search. In *Caniglia*, the Court instructed us to process difficult issues like these in the context of the three ways that officers may enter a home: a warrant, an exigency, and consent. Now that the CCE is no longer smothering the finer distinctions between exigency and consent, courts need to pick up where *Randolph* left off in parsing consent, trespass, and search. In my opinion, the best reading of *Randolph* is that single-tenant veto negates consent to search but not consent to enter to protect a co-tenant, even without an exigency.

Since the majority is not granting qualified immunity, I agree that the consent issue needs further attention in the district court. I leave it to the district court on remand to consider how this issue impacts the case.

---

[16]Whether *Randolph*'s single-tenant veto rule is the correct approach as a matter of constitutional law is a question for the Supreme Court, so I don't challenge that premise here. *See Fernandez*, 571 U.S. at 309–10 (Thomas, J., concurring).