RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee*,

      *v*.

JARON HOWARD MORGAN,

> *Defendant-Appellant*.

No. 22-1445

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00061-1—Paul Lewis Maloney, District Judge.

Decided and Filed:  June 26, 2023

Before:  SUTTON, Chief Judge; BATCHELDER and STRANCH, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant.  Erin K. Lane, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

SUTTON, Chief Judge.  Early on a February morning in Lansing, Michigan, an officer noticed a man, later determined to be Jaron Morgan, seemingly passed out at the wheel of a stopped, still running, car.  Without knocking on the car door, shining a flashlight into the car, or otherwise trying to arouse Morgan, the officer opened the car door and asked Morgan whether everything was okay.  Morgan was groggy, and the officer asked for his identification.  An altercation ensued.  The officer arrested Morgan and found a firearm in the car and drugs on him,

prompting a criminal indictment.  The district court denied Morgan's motion to suppress under the Fourth Amendment based on the community-caretaking doctrine, Morgan conditionally pleaded guilty, and the court sentenced him to 204 months.  We reverse the district court's denial of the motion to suppress.

I.

After a nighttime blizzard, Officer James Zolnai received an early morning dispatch call in February 2021.  A Northeast Lansing civilian located at the dead end of Leslie Street needed help getting his car out of a snowbank.  As Officer Zolnai made his way down the street, he passed a parked and running Chevy Malibu around 5:00 a.m.  The driver, Jaron Morgan, "appeared to be passed out" with his head tilted back.  R.63 at 7.

After Officer Zolnai assisted the civilian with the snow-encumbered car, he made a U-turn back down Leslie Street, and again noticed the seemingly passed-out occupant in the Malibu 11 minutes later.  Suspecting that an overdose or intoxication had incapacitated Morgan, Officer Zolnai decided to check on him.  Officer Zolnai parked about 15 feet away, turned on his body camera, did not turn on the police car's flashing lights, and told the police dispatch what he was doing.

As Officer Zolnai walked towards the Malibu, he noticed that the civilian he had just assisted stood nearby, potentially in the path of the vehicle.  In his experience, intoxicated individuals or those on opiates might "hit the gas" if startled.  *Id.* at 13.  Without first trying to arouse Morgan by knocking on the door or shining a light in the car, Officer Zolnai opened the car door.  He asked if Morgan was okay.  Morgan responded in a "groggy" way.  *Id.* at 16.  He asked Morgan for "ID," and Morgan moved his hand between the front seat and center console. R.30-2 at 0:47.  Worried that Morgan might be reaching for a firearm, Officer Zolnai asked him to step out.

Morgan refused to get out of the car.  A struggle followed.  Officer Zolnai grabbed Morgan's arms.  Morgan banged his head on the car horn.  Officer Zolnai called for backup. Morgan reached towards a cardboard box in the passenger seat.  Officer Zolnai ordered him to

put his hands behind his back and told Morgan he was under arrest.  Another officer arrived and struggled alongside Officer Zolnai to remove Morgan from the car.

The two officers eventually handcuffed Morgan.  More officers arrived.  In searching him, the officers found plastic bags on Morgan filled with fentanyl, methamphetamine, heroin, and cocaine.  They also found a semi-automatic pistol in the cardboard box.

Next came a grand jury indictment.  At a suppression hearing, the district court denied Morgan's attempt to suppress the firearm and drugs under the Fourth Amendment on the ground that the community-caretaking doctrine applied.  After the suppression ruling, Morgan conditionally pleaded guilty to possessing controlled substances with intent to distribute, 21 U.S.C. § 841(a), (b), and to possessing a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c).  Morgan reserved the right to appeal the court's suppression determination.  At sentencing, the court imposed a 144-month sentence on the drug charge to run consecutively with a 60-month mandatory minimum sentence on the firearm charge.

II.

Morgan challenges his conviction and sentence on several grounds.  But we need to reach only one of them:  his contention that Officer Zolnai violated the Fourth Amendment when he seized and eventually searched Morgan by unreasonably opening his car door without warning in the absence of any exigency.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Before entering private property, officers customarily must obtain a valid warrant to ensure that any search and seizure is not "unreasonable."  *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021).  If an emergency or other exigency exists, officers do not need to get a warrant and may provide "emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 460, 470 (2011)).  And officers may usually take actions that "any private citizen" might take, such as knocking on a door to see if anyone needs help.  *Id.* (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)).

Other exceptions exist in the context of automobiles.  Officers may search an automobile without a warrant if they have probable cause to believe it contains evidence of a crime.  *Carroll v. United States*, 267 U.S. 132, 153–54 (1925).  They may stop a vehicle if they have probable cause to believe the driver violated a traffic law.  *Whren v. United States*, 517 U.S. 806, 810 (1996).  When officers make permissible traffic stops, they may ask the occupants to step out.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam).  If officers arrest an occupant, they may search nearby compartments and containers under certain circumstances.  *Arizona v. Gant*, 556 U.S. 332, 343 (2009).  And officers may conduct sobriety checkpoints in view of the special needs and risks that come with automobiles.  *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 449–55 (1990)*.*  Consistent with these exceptions, the public's reasonable expectations of privacy inside automobiles are lower than they are in other private spaces given that automobiles are readily mobile, potentially dangerous, and heavily regulated.  *California v. Carney*, 471 U.S. 386, 390–93 (1985).

One other reasonableness consideration, not limited to cars, exists.  Not all police work seeks to prevent, investigate, or ferret out crime.  Much of an officer's day-to-day work in truth involves community service of a different order.  Officers help lost children return home, find missing persons, rescue pets, deal with domestic disputes before they get out of hand, keep an eye on a home when the resident travels, lock an unlocked door, arbitrate disagreements between neighbors about loud music, respond to health emergencies, check in on the elderly or those facing addiction challenges on behalf of their relatives, and help inebriates by preventing them from placing others at risk and by ensuring that they get home safely.  *See* Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. Chi. Legal F. 261, 261, 272, 284, 302 (1998); Wayne R. LaFave, Jerold H. Israel, Nancy J. King, Orin S. Kerr, 2 Criminal Procedure § 3.7(e) (4th ed. Supp. 2022) ("And if the police find a person unconscious or disoriented and incoherent in a vehicle, it is reasonable for them to enter the vehicle for the purpose of giving aid to the person in distress and of finding information bearing upon the cause of his condition.").

Law enforcement has served these "'watchman's' roles" long before the dawn of the Republic.  Livingston, *supra*, at 275.  From 1285 to 1827, the Statute of Winchester authorized

night watchmen to "watch the Town continually all Night" from sunset to sunrise and to detain any suspicious nightwalkers. *Atwater v. City of Lago Vista*, 532 U.S. 318, 333 (2001) (quoting Statute of Winchester of 1285, 13 Edw. 1 c. 4, §§ 5–6 (Eng.)). Under at least one monarch, the watchmen did more than just patrol; they performed "duties of municipal housekeeping such as lighting lamps, calling the time, and reporting unsanitary conditions." *State v. Bridewell*, 759 P.2d 1054, 1065 (Or. 1988) (en banc) (Peterson, C.J., concurring part and dissenting in part) (citing Thomas A. Reppetto, The Blue Parade 3 (1978)). Organized police forces emerged in the early New England States based on this model of public safety with communities viewing their officers as persons paid to perform acts that a private person "might have done voluntarily." *Id.* at 1065–66 (citing W.L. Melville Lee, A History of Police in England 333 (1901); David H. Bayley, *Police History* in 3 Encyclopedia of Crime and Justice 1120, 1124 (1983)). By the 1800s, police "receive[d] many calls requesting assistance in non-criminal matters." *Id.* at 1066 (citing Albert J. Reiss, Jr., The Police and the Public 63–64 (1971)).

The state courts have permitted this kind of community service in all kinds of settings. Officers may check on vehicles on the side of the road that may have lost power, *State v. Grmoljez*, 438 P.3d 802, 805 (Mont. 2019), stop a driver to warn him about an upcoming road obstruction, *State v. Hinton*, 112 A.3d 770, 772, 775 (Vt. 2014), pull over a vehicle with a possible domestic abuse victim inside, *State v. Short Bull*, 928 N.W.2d 473, 478 (S.D. 2019), and move an illegally parked car, *Davis v. United States*, 110 A.3d 590, 596–97 (D.C. 2015). *See Bridewell*, 759 P.2d at 1059 (majority) (permitting officers to perform warrantless caretaking functions with statutory authorization), *followed by* Oregon Rev. Stat. § 133.033(2)(A) (1991) (permitting officers to enter premises if reasonably necessary to render aid or locate missing persons).

Consistent with this history and tradition of allowing officers to respond to "'special needs' beyond normal law enforcement," the Fourth Amendment permits reasonable searches and seizures under the circumstances. *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987). The Supreme Court first acknowledged "community caretaking" of this sort in *Cady v. Dombrowski*, which upheld a police-inventory search of an abandoned automobile that had been involved in a car accident. 413 U.S. 433, 441–43 (1973); *see South Dakota v. Opperman*, 428 U.S. 364, 368,

375–76 (1976) (similar). Often described as those functions "totally divorced from the detection, investigation, or acquisition of evidence relating to" a crime, *Cady*, 413 U.S. at 441, community caretaking, it's fair to acknowledge and appreciate, occupies much of a police officer's day.

In view of *Cady* and the "watchmen's" tradition, we, along with "nearly every [other] circuit," have rejected challenges to evidence obtained in the course of "community caretaking" in at least some settings. *Clemons v. Couch*, 3 F.4th 897, 903–04 (6th Cir. 2021); *see, e.g.*, *United States v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir. 1991); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991), *vacated on other grounds*, 969 F.2d 1572 (5th Cir. 1992) (en banc); *United States v. King*, 990 F.2d 1552, 1560–61 (10th Cir. 1993); *United States v. Johnson*, 410 F.3d 137, 144–45 (4th Cir. 2005); *United States v. Harris*, 747 F.3d 1013, 1017–19 (8th Cir. 2014); *Vargas v. City of Philadelphia*, 783 F.3d 962, 972 (3d Cir. 2015); *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 517 (7th Cir. 2020).

But the Supreme Court and our court have been careful not to allow this historically grounded, and usually welcome, explanation for police work to overrun core Fourth Amendment protections. Both courts limit its application to the considerations that gave it birth. Community caretaking, for example, does not amount to a reasonable ground for entering a house without a warrant or without some other well-delineated and carefully cabined exigency. *Caniglia*, 141 S. Ct. at 1599–1600. Even outside the home, community caretaking permits only the use of evidence duly discovered in the course of advancing the caretaking function at hand. *See Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019). Concerns about the health of a driver by themselves generally do not permit the unannounced opening of a car door. The scope of any search or seizure must reasonably match its function, and concerns about the health of a driver generally do not stand in the way of announcing oneself or otherwise trying to alert the driver before suddenly opening a car door. *Cf. United States v. Lewis*, 869 F.3d 460, 464 (6th Cir. 2017). Only "when delay is reasonably likely to result in injury or ongoing harm to the community at large" and only when the officer's actions advance that public service will a seizure of evidence be reasonable. *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009); *see United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996).

Judged by these standards, Officer Zolnai unreasonably seized and searched Morgan when, without warning, he opened Morgan's car door to check on him. Even viewing the record in the light most favorable to the officer, as we must in the context of a district court's denial of a suppression motion, *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006), the officer's actions violated the Fourth Amendment.

Let us acknowledge at the outset that Officer Zolnai reasonably thought something was amiss and decided to do something about it. Morgan appeared unconscious at the wheel of a running vehicle for over ten minutes, which, based on Officer Zolnai's experience, raised a concern of intoxication or overdose. An intoxicated driver in a running car could endanger pedestrians and other drivers. *United States v. Koger*, 152 F. App'x 429, 430 (6th Cir. 2005). And an overdosed driver in snowy conditions without medical attention could face harm himself. *United States v. Mason*, No. 21-3225, 2022 WL 853304, at *3 (6th Cir. Mar. 23, 2022). Opting not to check on Morgan—surely the easiest path for Officer Zolnai to take that day—would have created potential peril for the driver. *Washington*, 573 F.3d at 289. To the officer's credit, he did not walk away.

But just as we appreciate Officer Zolnai's attentiveness, we cannot overlook the myriad, less intrusive paths available to him for addressing his concerns about Morgan. If the officer's concern was a potentially overdosed or intoxicated driver, it is difficult to understand why he did not take one of many steps before opening the door unannounced: say turning on the police car's emergency lights; shining a flashlight into Morgan's face; calling out to Morgan; or knocking on the window. In this caretaking setting, as in all of them, the intrusion must reasonably match the problem at hand. A reasonableness approach does not require an officer to exhaust "all conceivable alternatives," *Rohrig*, 98 F.3d at 1524, but it does not give the officer carte blanche either. In the absence of any time exigency or other emergency, it is difficult to understand why the officer did not take advantage of any of these or similar less-intrusive measures, all well suited to checking on Morgan's safety. Community-caretaking actions, in short, are permitted when reasonable but only when reasonable.

Officer Zolnai claims that he needed to open the car door suddenly because a startled and passed-out person might "hit the gas." Appellee's Br. 20–21. But this explanation prompts one

question after another.  What made him think the car was in gear?  Why would the car have been in gear for ten minutes, the amount of time he saw the car running?  Even a startled and groggy driver must put the car in gear before hitting the gas.  Where, moreover, is the evidence for this passed-out-driver-sudden-acceleration theory?  No empirical data or any other evidence, expert or otherwise, supports the idea—or at least none was offered at the suppression hearing.  If that really was a concern, moreover, why not just make sure no one was near the car on this wintry morning at 5 a.m.?  Come to think of it, why is a tap on the door, a police car's emergency light, or a light shone on the individual *more* startling than a police officer's sudden opening of the car door?  Concerns about startling people would seem to be alleviated by these lesser measures, not increased by them.  And wouldn't one of these lesser measures—shining a light in the car—confirm whether the car was in gear or not?  In the end, this novel theory for permitting officers to open car doors without warning lacks support, creates an exploitable exception to the Fourth Amendment, and defies common sense.

The theory also defies our cases.  In similar settings, we have deemed reasonable the conduct of officers who approached passed-out drivers or passengers to check on their well-being, but *only* after they confirmed as much or after some other exigency emerged.  For example, officers acted reasonably by opening an unresponsive driver's door after they confirmed the driver's need for aid:  they noticed he had sat in a parked, running car for hours; they shined a light in the car; when he still appeared asleep, they knocked "loudly" on the window; and when the driver failed to awake, they opened his door.  *United States v. Greene*, No. 20-6316, 2021 WL 3199239, at *1–3 (6th Cir. July 29, 2021).  Officers acted reasonably by opening a passenger's door when they encountered slumped-over occupants parked at a gas station in a nonrunning car and the passenger failed to wake up or make any movement in response to the officers' repeated knocks and yells.  *Mason*, 2022 WL 853304, at *1, *3, *4.  Other cases hew to a similar line.  *See Koger*, 152 F. App'x at 430–31 (no violation when officers knocked on the window of an unconscious driver in a parked, nonrunning car); *United States v. Townsend*, 206 F. App'x 444, 445–46, 448 (6th Cir. 2006) (no violation when officers opened a car door and grabbed the keys from the ignition after they shined a light in the driver's car, spotted a pistol, and verbally addressed an unresponsive driver in a parked, nonrunning car).

*United States v. Lewis* does not cross this line.  It held that officers responding to an intoxicated woman at a Wal-Mart could open the door of her sleeping boyfriend's truck to ask him to drive her home.  869 F.3d at 461, 463–64.  True, the officers did not attempt to wake up or knock on the boyfriend's window first.  *Id.* at 464.  But they did peer into the truck to make sure he was asleep, they opened the door without objection from his girlfriend, and they simply tried to help the inebriated girlfriend get her promised ride home.  *Id.* at 461.  In contrast to Officer Zolnai, these officers' actions reasonably matched the caretaking at hand.

Well intended though Officer Zolnai's actions may have been, they exceeded the limits of the Fourth Amendment.  Because the government does not advance any other reason for declining to suppress the use of this unreasonably obtained evidence, it must be suppressed. *United States v. See*, 574 F.3d 309, 314–15 (6th Cir. 2009).

We reverse the district court's denial of Morgan's motion to suppress, vacate Morgan's conviction and sentence, and remand for proceedings consistent with this opinion.