NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0197n.06

Case No. 23-3099

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 03, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| LANA JOHNSON, | ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: SUTTON, Chief Judge; GRIFFIN and READLER, Circuit Judges.

SUTTON, Chief Judge. Lana Johnson pleaded guilty to drug distribution, received a 32-month sentence, and reserved her right to challenge the searches that led to her arrest. We affirm the validity of each search.

I.

Detective Michael Palinkas received two tips that Lana Johnson and her husband Lester were dealing drugs from their home in Ashtabula, Ohio. One of the sources told Detective Palinkas that the Johnsons received shipments of fentanyl in the mail. The other source admitted to personally "obtaining several large quantities of methamphetamine" from the Johnsons at their home. R.45 at 5.

Detective Palinkas went to "spot-check" several locations suspected of "drug activity," including the Johnsons' apartment. R.105 at 7. On his initial pass, the officer noticed a blue Ford F-150, Lester's truck, in the Johnsons' driveway. The driver's door was open, revealing a woman

in the passenger seat leaning forward in a "slumped over" position. *Id.* at 8. Detective Palinkas proceeded to his surveillance spot down the street and around the corner, from which he could see only the top of the truck's cab. There, he watched the home for 20 minutes without incident. He then drove past the residence again and noticed that the woman in the truck remained slumped forward. Suspecting an overdose or some other medical problem, the officer approached the vehicle. The woman was "covered in sweat," had "constricted" pupils, and spoke with "slurred" speech. *Id.* To Detective Palinkas, who had seen "hundreds" of "overdose victims," the woman had the telltale signs of an overdose. R.106 at 2. He requested police backup and called an ambulance.

While they waited for the ambulance, the woman became more alert. When asked if she was Lana Johnson, she said no, "became a little bit upset," and "shoo[ed] [the officer] away with her arm." R.105 at 9. The woman used a cellphone to ask someone named Amber "to get Lester" and have him come outside. *Id.* She also told Amber that the police were there. Lester came outside and confirmed that the woman in the truck was his wife, Lana Johnson. Lester explained that Lana was "probably just 'sleeping'" in the passenger seat of the truck. R.45-4 at 2. He also told Detective Palinkas that Amber Jewell, who lived with the Johnsons, had driven the truck back to the apartment from Akron with Johnson in the passenger seat. Detective Palinkas asked where Amber was, but Lester said he did not know.

Backup police officers and the ambulance arrived soon after. While the paramedics checked on Lana, Detective Palinkas learned that Ashtabula County had a warrant out for her arrest. After the paramedics finished their initial examination, Johnson exited the truck but was "very unsteady on her feet." *Id.*

Officer Eric Massie led a drug-sniffing dog named Ruger around the truck. Ruger gave

2

two positive alerts near the open driver's side door. Each time, Ruger partially entered the truck's cab through the open driver's side door after alerting. Officer Massie testified that Ruger proceeded "on his own accord" and entered the vehicle because he was "trying to find the source of the odor." R.106 at 29. After the alerts, officers searched the vehicle and Detective Palinkas grabbed a purse from the passenger floor. Inside, he found Lana's identification and a small bag of powder that looked like heroin or fentanyl. Detective Palinkas showed Lana the bag of drugs and gave her a *Miranda* warning. She denied that the drugs belonged to her.

Detective Palinkas turned his attention to the apartment, where he thought the officers would find additional drugs and Amber. He sent two officers, Hollis and Martin, to enter the apartment, to conduct a protective sweep, and to contact anyone inside. Detective Palinkas justified the protective sweep on two grounds: (1) to protect the officers from anyone with weapons and (2) to prevent anyone inside from "destroy[ing] or tamper[ing]" with evidence of drugs. R.105 at 16. The two officers encountered Amber Jewell, who came outside and spoke to Detective Palinkas. Nobody else was inside the apartment.

At about this time, Detective Palinkas learned that Amber had an outstanding arrest warrant. Amber admitted that she and Lana recently had returned from Akron, where they purchased "'slow,' which is a street name or slang for heroin and/or fentanyl." R.45-4 at 3. Amber also told Detective Palinkas that Lana had likely used the "slow," and that the residence contained more heroin/fentanyl mixture as well as "a large bag" of "methamphetamine." *Id.*

With this information in hand, Detective Palinkas obtained a search warrant for the apartment. Executed later that day, the search uncovered methamphetamine. A grand jury indicted Lana for conspiracy to possess with the intent to distribute methamphetamine and possession with intent to distribute methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846.

Lana moved to suppress the evidence, arguing that the police violated her Fourth Amendment rights. The court denied the motion. Lana pleaded guilty and reserved the right to appeal the suppression ruling. The district court imposed a 32-month sentence.

II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, the Constitution requires police officers to obtain a warrant before entering private property. *Kentucky v. King*, 563 U.S. 452, 459 (2011). But sometimes "the exigencies of the situation"—a health emergency, the risk of destruction of evidence, the risk to officer safety—"ma[k]e [a warrantless search] imperative." *McDonald v. United States*, 335 U.S. 451, 456 (1948); *see also Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *United States v. Morgan*, 71 F.4th 540, 543 (6th Cir. 2023).

Before they obtained a search warrant, the police had three interactions with Johnson: the detective's first encounter with Lana while she was in the truck, the canine sniff, and the protective sweep of the apartment. We consider each in turn.

A.

Was Detective Palinkas's initial look into the truck constitutional? Under the community-caretaking doctrine, police "may make a warrantless entry onto private property" to "assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403. This "emergency aid exception" applies when an officer has "an objectively reasonable basis for believing" someone "is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (quotations omitted). In potential overdose cases, we ask whether it was "objectively reasonable for the officer[] to believe that [the victim] was overdosing on drugs and was in need

4

of immediate medical evaluation and attention." *Stricker v. Township of Cambridge*, 710 F.3d 350, 360 (6th Cir. 2013); *see also Brooks v. Rothe*, 577 F.3d 701, 708–09 (6th Cir. 2009).

Detective Palinkas's interaction with Lana in the truck meets these criteria. By then, he had received two reports that the Johnsons sold drugs from their apartment. By then, he had seen Lana in the same slumped-over, forward-leaning position she had been in 20 minutes earlier. A reasonable officer in his position could fairly suspect that Lana had overdosed. *See United States v. Lewis*, 869 F.3d 460, 462–63 (6th Cir. 2017) (explaining that police may approach a vehicle and open the door to talk to an unconscious person for community caretaking purposes); *United States v. Greene*, No. 20-6316, 2021 WL 3199239, at *1–3 (6th Cir. July 29, 2021).

Detective Palinkas then did what a reasonable officer and private citizen would do. He stepped onto the Johnsons' driveway. He looked into the truck to make sure Lana was alright. She was not. Detective Palinkas saw her "covered in sweat," with "constricted" pupils and "slurred" speech. R.105 at 8. At that point, Detective Palinkas took the next step that any concerned "private citizen might" do, and he called for an ambulance. *Morgan*, 71 F.4th at 543 (quotation omitted). All told, his actions were objectively reasonable.

Lana claims that this conclusion contradicts our decision in *United States v. Morgan*. Not so. We acknowledged there that it was reasonable for a police officer to check on a driver who "appeared unconscious at the wheel." *Id.* at 545. But we reversed the district court's denial of a motion to suppress because of the *way* the officer did so—by immediately opening the car door and, despite resistance, aggressively arresting the just-awakened man. *Id.* at 545–46. The officer's conduct in *Morgan*, in other words, was unreasonable because he failed to take any of "the myriad, less intrusive paths available to him." *Id.* at 545. By contrast, Detective Palinkas waited until he noticed Lana in the same position for twenty minutes, learned that she had access to drugs,

approached Lana respectfully, and, upon finding telltale signs of an overdose, he called for medical aid. That was reasonable.

B.

Did the dog sniff violate the Fourth Amendment? "It is well-established that a canine sniff is not a search within the meaning of the Fourth Amendment," so long as the police are "lawfully . . . present at the location where the sniff occurs." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012) (quotation omitted). A sniff reveals only "the location of a substance that no individual has any right to possess." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). "An alert to the presence of drugs by a properly trained narcotics detection dog is sufficient to establish probable cause to search a vehicle." *Sharp*, 689 F.3d at 618.

The police were lawfully present at the location before the dog sniff began. While paramedics checked on Lana, Detective Palinkas learned that Ashtabula County had a warrant for her arrest. That fact gave the police a lawful reason to remain on the Johnsons' property after the paramedics left and thus a legitimate vantage point from which to conduct the dog sniff. *See Payton v. New York*, 445 U.S. 573, 603 (1980); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 689 (6th Cir. 2006) (extending *Payton* to misdemeanor arrest warrants).

Lana offers several counterarguments, all unpersuasive. She maintains that the sniff was unreasonable because the police purposefully left the truck door open, allowing Ruger to enter the vehicle. To support this claim, she relies on an out-of-circuit decision in which "the officers themselves opened the [car] door" prior to the sniff. *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998). That is not this case. In contrast to *Winningham*, the officers had a reasonable suspicion that drugs would be found in the car, and they did not open the truck door.

6

Lana points to no legal authority, and we know of none, that requires police officers to close car doors before performing a drug sniff.

Lana also invokes *Taylor v. City of Saginaw*, which held that marking tires with chalk to see how long cars had been parked in a given area constituted a search under the Fourth Amendment. 922 F.3d 328, 332–33 (6th Cir. 2019) (amended opinion). "Like the marking of chalk on a car tire's tread," Lana argues, "a drug detecting K9 passing through an open door, twice, into the interior of a vehicle constitutes a search." Appellant's Br. 36. But the conclusion in *Taylor* turned on the fact that marking with chalk was a "regulatory exercise, rather than a community-caretaking function." *Taylor*, 922 F.3d at 331. Here, Detective Palinkas entered the Johnsons' property to provide medical assistance to an individual in need. By the time Officer Massie led the sniff, the officers had a warrant for Lana's arrest, which gave them a lawful reason to enter the driveway.

## C.

Did the protective sweep violate the Fourth Amendment? A warrantless search of a home usually violates the Fourth Amendment. *King*, 563 U.S. at 459. But exceptions exist. The officers may conduct a protective sweep if they have evidence that there are armed individuals in the home or to prevent anyone inside from destroying drug evidence. *Maryland v. Buie*, 494 U.S. 325, 334 (1990) (officer safety); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988) (evidence destruction).

The officer safety exception does not apply. The officers did not offer any evidence of a "risk of danger to police or others." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). Only when "articulable facts" show "that the area to be swept harbors an individual posing a danger

to those on the arrest scene" may the officers conduct such a sweep. *Buie*, 494 U.S. at 334. Nothing in the record demonstrates that a dangerous individual lurked in the Johnsons' home.

The destruction of evidence exception applies. A "warrantless entry onto private property" may be permitted to "prevent the imminent destruction of evidence." *Brigham City*, 547 U.S. at 403. This exception, like the others, applies only when "the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *King*, 563 U.S. at 462. The police must have (1) probable cause that illegal drugs will be found in the apartment, *see United States v. McClain*, 444 F.3d 556, 561–62 (6th Cir. 2005); (2) a reasonable belief that someone is inside, *see Lewis*, 231 F.3d at 241; and (3) a reasonable belief that that person will likely destroy the evidence, *see id.*

Ample evidence confirmed the presence of illegal drugs in the home. Detective Palinkas had two reliable tips that the Johnsons sold drugs from their home, one from a source who had "proven [to be] credible during drug investigations" and another from a source who gave "specific" information "in reference to [the Johnsons] trafficking methamphetamine." R.105 at 19. Those tips were corroborated by his own experience and interactions the day of the search. He also saw clear signs that Lana had overdosed from drugs. And he found a bag of suspected heroin or fentanyl. Taken together, these facts created a "fair probability" in the minds of "reasonable and prudent" people that illegal drugs would be found inside the apartment. *Kaley v. United States*, 571 U.S. 320, 338 (2014).

Detective Palinkas also reasonably believed that someone was inside. Soon after Detective Palinkas began speaking to Lana, she called someone named Amber and told her "to get Lester" and bring him outside. R.105 at 9. Lester emerged from the apartment and told Detective Palinkas that Amber Jewell lived with the Johnsons and that she and Lana had recently returned from a trip

8

to Akron in the truck. Although Lester told Detective Palinkas that he did not know where Amber was, that statement was belied by what Detective Palinkas overheard on the phone. It was therefore reasonable for Detective Palinkas to believe that at least one person, Amber, remained inside the apartment.

Detective Palinkas reasonably believed that Amber would destroy the drugs in the home. The detective had "objective grounds to believe that [those inside] were aware that police were close on their trail." *United States v. Elkins*, 300 F.3d 638, 656 (6th Cir. 2002). He heard Lana tell Amber via phone call that the police were present. He also knew that Amber was the last person to drive the truck, a truck in which Lana had just overdosed and a truck that contained a bag of what looked like heroin or fentanyl. Together with the reliable tips, this information gave Detective Palinkas a reasonable basis for believing that Amber, "whose suspicions were already heightened due to the presence of the . . . police," "would immediately" destroy evidence "within the time necessary to obtain a search warrant." *United States v. Campbell*, 261 F.3d 628, 633 (6th Cir. 2001). The protective sweep complied with the Fourth Amendment.

III.

Lana separately argues that the search warrant lacked probable cause. Courts use a "common-sense" approach to determine whether there is a "fair probability" that "evidence of a crime will be found in a particular place." *United States v. Tisdale*, 980 F.3d 1089, 1093 (6th Cir. 2020) (quotation omitted).

The warrant passes that test. In addition to the reliable tips, Lana's overdose symptoms, and a bag of suspected heroin, the affidavit included Amber's incriminating admissions that she and Lana had acquired heroin or fentanyl from their trip to Akron and that the Johnsons had methamphetamine and fentanyl inside the apartment. Taken together, these facts create more than

a "fair probability" that drug evidence would be found in the Johnson home. *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013).

Lana's counterarguments all hinge on the exclusion of Amber Jewell's statements. As she sees it, "the statement made by Amber Jewell" that followed the protective sweep must be excluded as "fruit of the poisonous tree." Appellant's Br. 37–38. But even if we thought that the protective search was unreasonable—we do not—the *Leon* good-faith exception to the exclusionary rule would apply. When the police act in good faith and "the facts surrounding the [] warrantless search [are] close enough to the line of validity to make the [] officers' belief in the validity of" their search "objectively reasonable," the "Leon exception bars application of the exclusionary rule." *McClain*, 444 F.3d at 566. All evidence shows that the officers acted in good faith and that they reasonably believed their presence was lawful. The warrant-based search did not violate Lana's Fourth Amendment rights.

We affirm.