COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Raphael and White
Argued at Richmond, Virginia


RYAN DOUGLAS ROBERTS

                                                      OPINION BY
v.        Record No. 1427-23-2              JUDGE STUART A. RAPHAEL
                                              SEPTEMBER 17, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

Elliott M. Harding (Harding Counsel, PLLC, on brief), for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Challenging his firearm and drug convictions, Ryan Douglas Roberts argues that the trial

court should have suppressed the evidence that the police officer discovered from his warrantless

entry into the car in which Roberts was asleep in the passenger seat.  The car was parked near a

store in parking lot that the officer knew to be the site of overdose incidents.  When the officer

approached the passenger window, he saw that Roberts was grasping a pistol that was tucked

into his waistband.  After the officer tapped twice on the window, Roberts awoke.  But he

appeared intoxicated from drugs or alcohol, his speech was slurred, and he did not answer the

officer's questions.  The officer announced that he was opening the door to secure the weapon.

But as the officer did so, he saw a bag of drugs in plain view sticking out of Roberts's pants

pocket.

We hold that the officer did not violate the Fourth Amendment because his warrantless

entry into the car was reasonable under the emergency-aid exception to the warrant requirement.

The officer could reasonably believe that Roberts's holding a gun while he was disoriented and

apparently intoxicated endangered bystanders, the officer, and Roberts himself. Accordingly, we affirm the judgment.

BACKGROUND

At dusk on April 10, 2022, Officer Daniel Shetler of the Albemarle County Police Department was conducting a "protective patrol" of a Walmart parking lot. Shetler had been called there several times for overdose incidents, both in the store and in the parking lot.

Shetler spotted a parked car in which a man (who turned out to be Roberts) was "either asleep or unconscious" in the passenger seat. Roberts's head was leaning against the window. His eyes were closed, and his mouth was open. Shetler got out of his patrol car to see if Roberts needed assistance. The front-facing camera of the patrol car showed a bustling parking lot, with several store patrons walking to and from their cars. As Shetler approached the passenger-side window, he saw that Roberts was "grasping the handle" of a handgun in "plain view," tucked into his waistband.

Roberts did not stir when Shetler first knocked on the window. After Shetler knocked again, Roberts woke up, appearing "a little startled and a little dazed." Shetler spoke to Roberts through the window, but Roberts did not answer. Roberts's "eyes were glazed over, his speech was slow and slurred and his eyes were having difficulty tracking." Shetler asked Roberts to put his hands up and asked if he was okay. Roberts raised his hands but "didn't really communicate or answer any of [Shetler's] questions." It appeared to Shetler that Roberts was "impaired or under the influence of something based on his demeanor and his inability to communicate."

Shetler opened the car door and told Roberts that he was "going to remove the handgun for my safety and his." As Shetler opened the door and retrieved the gun, he saw a plastic baggie sticking out of Roberts's right-side pants pocket. The plastic baggie contained a white substance.

- 2 -

Shetler's body-camera footage shows the baggie in plain view. As Roberts kept his hands up, Shetler slowly reached in and removed the gun, placing it on the roof of the car.

Shetler again asked if Roberts was okay. Roberts responded that his girlfriend had gone inside the Walmart. Donning gloves from his back pocket, Shetler said, "I'm just going to quick[ly] grab this, okay," and he removed the baggie from Roberts's pocket. Shetler asked Roberts to step out of the car. Roberts briefly tried to flee, but Shetler "assisted [Roberts] to the ground" and arrested him. Roberts admitted that the plastic baggie contained heroin. He also admitted to being a felon. Shetler patted him down. During the pat down, Shetler found another bag of heroin and a third bag that Roberts admitted contained methamphetamine.

Roberts was indicted by a grand jury on two counts of possession of a Schedule I or II controlled substance in violation of Code § 18.2-250 and one count of possession of a firearm within ten years of a felony conviction, in violation of Code § 18.2-308.2. Roberts moved to suppress the evidence on the ground that he was "unlawfully seized from the moment Officer Shetler opened the car door."

The trial court denied the motion after a suppression hearing in which Officer Shetler was the only witness. The court found that Shetler approached the car because Roberts appeared to be passed out in the passenger seat and that Shetler's doing so was not pretextual. The court said that, after Shetler saw the gun and awakened Roberts, Shetler was reasonably concerned that "[s]omeone who is under the influence of illegal substances or legal substances to the point that it affects their speech and their manner and demean[o]r may not be in the condition to possess a firearm." Roberts's "eyes were glassed over and his speech was slurred." The court noted that, while this could have been because Roberts was sleeping, it also was "reasonably consistent" with "someone [who] had been using illegal substances" or was "under the influence." The court found that the incident "demand[ed] an immediate response from the officer." At that point, the

court concluded, Shetler could remove the gun, both for Roberts's safety and his own. And once the car door was opened, the court concluded, the plastic baggie was in plain view and properly seized.

Under a plea agreement that preserved his right to appeal the suppression ruling, Roberts pleaded guilty to two counts of possession of a Schedule I or II controlled substance (Code § 18.2-250) and to one count of possession of a firearm after being convicted of a felony more than ten years earlier (Code § 18.2-308.2). The trial court imposed a combined sentence of 17 years' incarceration with all but 3 years and 5 months suspended. Roberts noted a timely appeal.

ANALYSIS

The only question presented here is whether the trial court should have suppressed the evidence that resulted from Officer Shetler's warrantless entry into the vehicle. The standard of appellate review has been long settled. "A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo on appeal." *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002). "[W]e give deference to the factual findings of the trial court and independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Id. See also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that "determinations of reasonable suspicion and probable cause" are reviewed de novo but "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"). "The defendant has the burden to show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the Commonwealth, was reversible error." *Murphy*, 264 Va. at 573.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme] Court has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). Although warrantless searches are "'presumptively unreasonable,'" that "presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Commonwealth v. Campbell*, 294 Va. 486, 494 (2017) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "Accordingly, the warrant requirement is subject to certain reasonable exceptions." *King*, 563 U.S. at 459.

In the trial court and here, the parties have argued for and against two exceptions: the emergency-aid exception and the community-caretaker exception. Roberts maintains that neither exception applies. The Commonwealth responds that Shetler's warrantless entry was proper under either exception. But the Commonwealth was reluctant at oral argument to say which doctrine provided the better basis for decision. We first explain why the emergency-aid exception provides the best and narrowest ground. We then show why Shetler's warrantless entry was proper under that exception.

*A. We apply the emergency-aid exception, not the community-caretaker exception.*

As the Supreme Court explained in *King*, a "well-recognized exception [to the warrant requirement] applies when "'the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" 563 U.S. at 460 (second alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). *King* "identified several exigencies" that fall within that exception: the

"emergency aid" exception, the "hot pursuit of a fleeing suspect," and "the need 'to prevent the imminent destruction of evidence.'" *Id.* (quoting *Brigham City*, 547 U.S. at 403). "Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." *Id.* at 470.

The modern emergency-aid exception traces its origins to *Mincey v. Arizona*, where the Court said that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." 437 U.S. at 392.[1] The Court applied that doctrine in *Brigham City*, explaining that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." 547 U.S. at 403. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (quoting *Mincey*, 437 U.S. at 392). Thus, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* *See also Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam) (same); *Kyer v. Commonwealth*, 45 Va. App. 473, 480 (2005) (en banc) (stating that the emergency-aid exception "recognizes the 'right of the police to enter and investigate' when someone's health or physical safety is genuinely threatened" (quoting *Reynolds v. Commonwealth*, 9 Va. App. 430, 437 (1990))).

The emergency-aid exception uses an objective standard. It "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Fisher*, 558 U.S. at 47 (quoting *Brigham City*, 547 U.S. at 404-05). "It

---

[1] The doctrine also has common-law antecedents. *See* Edward Coke, *Fourth Part of the Institutes of the Laws of England, Concerning the Jurisdiction of Courts* 177 (6th ed. 1681) (noting that a justice of the peace could make a warrantless entry into a house "upon Hue and Cry of one that is slain or wounded, . . . as he is in danger of death").

- 6 -

requires only 'an objectively reasonable basis for believing' that 'a person within . . . is in need of immediate aid.'" *Id.* (first quoting *Brigham City*, 547 U.S. at 406; and then quoting *Mincey*, 437 U.S. at 392). *See also Merid v. Commonwealth*, 72 Va. App. 104, 113 (2020) (same), *aff'd*, 300 Va. 77 (2021) (per curiam), *cert. denied*, 142 S. Ct. 1137 (2022); *Robinson v. Commonwealth*, 273 Va. 26, 37 (2007) (same).

That "objective inquiry into appearances" must not be "replaced . . . with [a] hindsight determination that there was in fact no emergency." *Fisher*, 558 U.S. at 49. "Under the Fourth Amendment, 'reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"' and the 'calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Ross v. Commonwealth*, 61 Va. App. 752, 762 (2013) (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam)). As we said in *McCarthy v. Commonwealth*, 73 Va. App. 630 (2021), "hindsight is 20/20, foresight is not." *Id.* at 644.

"When determining whether the emergency exception applies, a court should not look at 'each separate event in isolation' in support of the *faux* conclusion that 'each, in itself, did not give cause for concern.'" *Ross*, 61 Va. App. at 761 (quoting *Ryburn*, 565 U.S. at 476). "As is always the case, a court should examine the totality of the circumstances, for 'it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture.'" *Id.* (quoting *Ryburn*, 61 Va. App. at 476-77).

The community-caretaker doctrine, on the other hand, traces its origins to *Cady v. Dombrowski*, 413 U.S. 433 (1973). The Court there held that it was reasonable for officers to conduct a warrantless search of a damaged car to secure a service weapon that they believed had been left behind by the driver, an off-duty police officer. *Id.* at 446-48. As the Court explained,

"[l]ocal police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. The warrantless search was justified because of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447. In *South Dakota v. Opperman*, 428 U.S. 364 (1976), the Court gave as another example of "community caretaking functions" the "routine practice of securing and inventorying the . . . contents" of impounded vehicles. *Id.* at 368-69.

We said in *Merid* that "[c]aselaw from this Court has been less than clear in the past when discussing the emergency aid exception and the community caretaker exception, often conflating the two." 72 Va. App. at 112 n.3. *Merid* then found that the emergency-aid exception was the appropriate doctrine to apply to the officers' entry into the defendant's home after receiving reports suggesting that he was suicidal. *Id.* at 116-17. The lack of doctrinal clarity that we mentioned was not entirely of our making. "For nearly half a century after *Cady*, the Supreme Court declined to further elucidate the principles discussed in that case." *Clemons v. Couch*, 3 F.4th 897, 903 (6th Cir. 2021). "Over time, nearly every [federal] circuit unearthed from *Cady* a community-caretaker exception to the warrant requirement . . . ." *Id.*

The Supreme Court recently revisited *Cady*, however, holding that police officers' community-caretaking functions do not "create[] a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia v. Strom*, 593 U.S. 194, 196 (2021). The Court said that *Cady* could not be stretched that far. *Id.* at 198-99. *Caniglia* explained that although *Cady* "involved a warrantless search for a firearm," "the location of that search was an impounded vehicle—not a home—'"a constitutional difference"' that the opinion repeatedly stressed." *Id.* (quoting *Cady*, 413 U.S. at 439); *see also id.* at 205 (Kavanaugh, J., concurring)

- 8 -

("[A]ny such standalone community caretaking doctrine was primarily devised for searches of cars, not homes.").[2]

Justice Alito would have gone further in *Caniglia*. He read the majority to "hold . . . that there is no special *Fourth Amendment* rule for a broad category of cases involving 'community caretaking.'" *Id.* at 200 (Alito, J., concurring). In his view, *Cady* "did not recognize any such 'freestanding' *Fourth Amendment* category"; it "merely used the phrase 'community caretaking' in passing." *Id.* (quoting *Cady*, 413 U.S. at 441). But no other justice joined Justice Alito's concurrence. *See also United States v. Treisman*, 71 F.4th 225, 232-34 (4th Cir. 2023) (upholding warrantless search of vehicle under the community-caretaker doctrine, stating that *Caniglia* "did not disturb the principle that police officers may conduct warrantless searches of vehicles when called on 'to discharge noncriminal "community caretaking functions," such as responding to disabled vehicles or investigating accidents'" (quoting *Caniglia*, 593 U.S. at 196)).

As our Supreme Court held in *Merid*, nothing in *Caniglia* affects the viability of the emergency-aid exception to permit the warrantless entry into a home when reasonable to protect the life or safety of persons inside. 300 Va. at 77 n.*. The presence of "exigent circumstances" was not at issue in *Caniglia* because the government had "forfeited the point." 593 U.S. at 198. Other justices in *Caniglia* wrote separately to make clear that a warrantless entry into the home would be justified "when there is a 'need to assist persons who are seriously injured or threatened with such injury.'" *Id.* at 200 (Roberts, C.J., concurring) (quoting *Brigham City*, 547 U.S. at 403); *id.* at 206 (Kavanaugh, J., concurring) ("[T]he Court's exigency precedents . . . permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reasonable to act now.").

---

[2] We foreshadowed in *Wood v. Commonwealth*, 27 Va. App. 21, 27 (1998) (en banc), that "the community caretaking function used to uphold a vehicle search, such as existed in *Cady*, may not be sufficient to justify an intrusion into an individual's home."

- 9 -

"Under proper circumstances, both [the emergency-aid and community-caretaker] doctrines apply not only to the protection of human life or to avoid serious injury, but also to the protection of property interests." *Kyer*, 45 Va. App. at 481 n.1. Unlike the emergency-aid exception, however, "[t]he community-caretaker exception . . . extends to situations not involving any emergency conditions." *Ross*, 61 Va. App. at 760 n.3.

Since *Cady*, our Court has imposed limits on the community-caretaker exception that are not part of the emergency-aid doctrine. For instance, the community-caretaker exception will not immunize an inventory search that is not "conducted pursuant to standard police procedures" or that is "a pretextual surrogate for an improper investigatory motive." *Knight v. Commonwealth*, 71 Va. App. 771, 784 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 59 (2015)); *Williams v. Commonwealth*, 42 Va. App. 723, 731 (2004) (same); *King v. Commonwealth*, 39 Va. App. 306, 310 (2002) (same); *see also Wood*, 27 Va. App. at 27 ("Because the evidence indicates that the search was 'a pretext concealing an investigatory police motive,' the search cannot be deemed a valid exercise of the community caretaking function." (quoting *Opperman*, 428 U.S. at 376)). We have also said about the community-caretaker exception that "the warrantless entry must be 'totally divorced' from a criminal investigation." *Knight v. Commonwealth*, 61 Va. App. 297, 306 (2012) (quoting *Cady*, 413 U.S. at 441).

Under the emergency-aid exception, by contrast, "[t]he officer's subjective motivation is irrelevant." *Brigham City*, 547 U.S. at 404. It did not matter in *Brigham City*, for instance, "whether the officers entered . . . to arrest . . . and gather evidence . . . or to assist the injured [person] and prevent further violence." *Id.* at 405.

Jurists have divided over which doctrine applies in the context of a non-criminal investigation that ripens into concern about a potential emergency. In *People v. Brown*, No. 51,

2024 N.Y. LEXIS 630, __ N.E.3d __ (May 21, 2024), New York's highest court recently applied the community-caretaker exception in the context of stopping a moving car out of concern that a passenger may have needed aid. *Id.* at *7-15. But a concurring judge disagreed with that choice. *See id.* at *28 (Rivera, J., concurring). As Judge Rivera noted, "[m]uch of what other courts embracing the exception treat as community caretaking is, in actuality, a police response to imminent danger or an example of traditional law enforcement for which prevailing Fourth Amendment principles already account." *Id.*

In *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009), the Fourth Circuit said that the two "doctrines overlap conceptually" but have "different 'intellectual underpinning[s].'" *Id.* at 554 (quoting *Hunsberger v. Wood*, 564 F. Supp. 2d 559, 567 (W.D. Va. 2008), *rev'd*, 570 F.3d at 549). "The community caretaking doctrine requires a court to look at the *function* performed by a police officer, while the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed." *Id.* Thus, "when the search in question was performed by a law enforcement officer responding to an emergency, and not as part of a standardized procedure, the exigent circumstances analysis and its accompanying objective standard should apply." *Id.*

We need not decide whether those distinctions between the two doctrines are correct. It suffices that the emergency-aid exception is the better doctrine to apply here. To be sure, Officer Shetler's proactive patrol of the Walmart parking lot could be described as an exercise of his caretaking duties, given the history of overdoses at that location. But it was Shetler's discovery of an apparently intoxicated or otherwise impaired Roberts, holding a gun in his lap, that prompted the exigency that the Commonwealth invokes to justify Shetler's warrantless entry into the car. Applying the emergency-aid exception avoids having to examine Shetler's subjective purpose. It also avoids our having to decide whether Shetler's concern about public safety was

- 11 -

intermixed with law-enforcement concerns. And it likewise does not matter whether Shetler's proactive patrol was part of standard police procedure. In short, because "we look for the best and *fewest* grounds on which to resolve this appeal," *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023), the emergency-aid exception provides the best and narrowest ground for decision.

      *B. The warrantless entry was reasonable under the emergency-aid exception.*

Applying independent appellate review, *see Murphy*, 264 Va. at 573, we hold that it was reasonable under the emergency-aid exception for Officer Shetler to have made a warrantless entry into the vehicle to secure the gun that an apparently intoxicated or impaired Roberts was holding in his lap. *See Fisher*, 558 U.S. at 49 ("It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else."). Shetler's stated concern that Roberts was under the influence of drugs was objectively reasonable. Roberts appeared dazed and disoriented, he failed to answer the officer's questions, and the parking lot was known for its history of drug "overdoses."[3] The gun that Roberts was holding in his lap could have been fired—whether on purpose or accidentally—risking injury or death to Roberts, Shetler, or any of the bystanders in the parking lot. *Cf. Hill v. Commonwealth*, 297 Va. 804, 816 (2019) (per curiam) ("Doing nothing risked the possibility of being shot at point-blank range. Walking away risked the possibility of being shot in the back. The detectives thus did what any experienced police officer would and should do in this situation—physically seize the man and separate him from the potential weapon.").

---

[3] *Cf. Hill v. Commonwealth*, 297 Va. 804, 816 (2019) (per curiam) (finding the "contextual facts" that the suspect was parked in "a high-crime, high-drug area" supportive of the detectives' concern that the driver was reaching for a gun when he saw them approach); *id.* at 826 (Millette, SJ., dissenting) (agreeing that whether the area involved is a "high crime, high drug area remains a factor to be considered").

We disagree with Roberts that when Officer Shetler could not determine from outside the car window that Roberts in fact was suffering a medical emergency, Shetler had to walk away. Shetler did not have to "throw up [his] hands and call it quits once the initial cursory survey provided no clues as to appellant's medical condition." *McCarthy*, 73 Va. App. at 644.

Nor was Shetler required to wait until an impaired Roberts brandished his pistol or fired it before Shetler could act to secure the weapon and determine whether Roberts needed medical assistance. *Cf. Brigham City*, 547 U.S. at 406 ("Nothing in the Fourth Amendment required [the officers] to wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering."). "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one . . . encountered here." *Fisher*, 558 U.S. at 49. "Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But '[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.'" *Id.* (quoting *Brigham City*, 547 U.S. at 406).

The justification for the warrantless entry here is also not a "so-called 'police-created exigency.'" *King*, 563 U.S. at 469; *see also Evans v. Commonwealth*, 290 Va. 277, 288-91 (2015) (discussing *King*). When, as here, the officer "did not violate or threaten to violate the Fourth Amendment prior to the exigency," *King*, 563 U.S. at 472, the exigency of an apparently intoxicated or incapacitated Roberts holding a gun justified the warrantless entry.

Officer Shetler acted reasonably in deciding that he needed to secure the gun. *Cf. Brigham City*, 547 U.S. at 406 ("The manner of the officer['s] entry was also reasonable."). Officer Shetler knocked on the window twice. Roberts appeared intoxicated and did not respond to questions while holding a gun in his lap. Shetler announced that he planned to open the car door to secure the gun, and he did so slowly to avoid provoking a violent reaction.

- 13 -

Shetler's efforts to speak with Roberts and the immediate danger posed by the gun distinguish this case from *United States v. Morgan*, 71 F.4th 540 (6th Cir. 2023), on which Roberts relies. The officer there suspected the sleeping driver to have overdosed, but the officer opened the car door unannounced, without taking any other preliminary steps before entering. *Id.* at 545. The Sixth Circuit found the entry unreasonable, explaining that "concerns about the health of a driver generally do not stand in the way of announcing oneself or otherwise trying to alert the driver before suddenly opening a car door." *Id.* Officer Shetler took those reasonable steps here.

The balance of interests here would have been different had Roberts been in his home, rather than a shopping-center parking lot. The Supreme Court has made clear that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman*, 428 U.S. at 367. After all, a car generally "travels public thoroughfares where both its occupants and its contents are in plain view." *Id.* at 368 (quoting *Cardwell v. Lewis*, 417 U.S. 538, 590 (1974)).

Applying the emergency-aid exception and considering the "totality of the circumstances" presented here, *Ross*, 61 Va. App. at 761, we hold that it was reasonable for Officer Shetler to open the car door to secure the gun because it reasonably appeared that Roberts posed an immediate danger to himself and to others. Because that warrantless entry was permissible, the baggie of drugs sticking out of Roberts's pocket was appropriately seized. "[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 437 U.S. at 393; *see also McCarthy*, 73 Va. App. at 643-44 (discussing permissible scope of plain-view sweep). Accordingly, the evidence discovered because of the warrantless entry was not obtained in violation of the Fourth Amendment.

CONCLUSION

Because the warrantless entry into the car was reasonable under the emergency-aid exception, there was no basis under the Fourth Amendment to suppress the evidence. Thus, the trial court properly denied Roberts's suppression motion.

*Affirmed.*